# United States Court of Appeals
## For the First Circuit

Nos. 01-2495
     01-2621

UNITED STATES OF AMERICA,

Appellee,

v.

GIORGIY NISHNIANIDZE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lynch, Circuit Judge.

Elizabeth L. Bostwick, with whom Joseph S. Berman and Berman & Dowell were on brief, for appellant.
Samuel W. Buell, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, were on brief, for appellee.

August 26, 2003

**TORRUELLA**, **Circuit Judge**.  Giorgiy Nishnianidze raises a host of challenges to his extortion conviction.  After careful review, we affirm.

## I.  Facts

### A.  Adoption

Lewis Finfer and Judith Shea, a married couple, adopted an infant son, Alexander, from the country of Georgia in March 1996.  They consulted with a Massachusetts adoption agency called Wide Horizons for Children, Inc., which in turn worked with Nishnianidze (pronounced nish-nee-ah-NID-zuh), an attorney in Georgia.  Finfer and Shea paid $10,000 for the adoption -- half to Wide Horizons and half to Nishnianidze for his legal services.

Finfer and Shea traveled to Georgia to pick up their son, staying with Nishnianidze at his home.  Finfer and Shea asked to meet the birth mother but Nishnianidze told her that he did not know how to locate her.  The adoption was without incident.  Nishnianidze provided the couple with Georgian legal documentation of the adoption, including a document in which Alexander's birth mother relinquished all parental rights.  These documents were recognized by a Massachusetts court that finalized the adoption after Finfer, Shea, and Alexander returned home.

### B.  Nishnianidze Contacts Parents

Nishnianidze emigrated to Brooklyn, New York in October, 1998, seeking permanent residency from the Legacy Immigration and

Naturalization Service. Finfer and Shea heard nothing from Nishnianidze until January 26, 1999, when he called their home and spoke to Shea. He said he was in Boston and asked to see the family. Shea told Nishnianidze to call Finfer, who then invited Nishnianidze to their home for dinner.

Finfer picked up Nishnianidze in downtown Boston and drove him to the family's home in Dorchester. That evening, on the pretense of documenting a successful international adoption, Nishnianidze filmed the family with a video camera he brought. Intimating that the birth mother was having "a rough time," he asked if the couple would provide financial support to the birth mother and her two children in Georgia. The couple refused.

At the end of the evening, Finfer drove Nishnianidze back to downtown Boston. During the car ride, Nishnianidze told Finfer that Alexander's birth mother was upset, might challenge the legality of the adoption, had made threats to Nishnianidze and Nishnianidze's family, and wanted $50,000 from Finfer and Shea. Finfer was upset by the conversation and told Nishnianidze it "sounded like blackmail."

Finfer relayed the conversation to Shea. The couple contacted an attorney the next day and met with the FBI on January 28, 1999. At this meeting, Finfer and Shea agreed to record their subsequent conversations with Nishnianidze. They also received advice from the agents about how to gather information

from Nishnianidze.  After this initial meeting, Finfer and Shea occasionally spoke with a single FBI agent about their conversations with Nishnianidze and received suggestions as to how to handle the discussions.

### C.  Telephone Calls

On the morning of January 29, 1999, Nishnianidze called Shea at home, and she recorded the conversation.  Nishnianidze began by describing recent events in Georgia, including opposition and challenges to international adoptions.  He stated that Alexander's biological mother was upset the boy had been adopted by an American family and had threatened harm to Nishnianidze and Nishnianidze's son if Alexander was not returned.  Nishnianidze stated that he came to the United States because of the threats, and that the birthmother requested "from me to take the child back."  He told Shea that if she paid him $50,000 (to be given to the biological mother), the biological mother would guarantee not to pursue the child.

Nishnianidze stressed that he had been threatened and abused by Alexander's biological family, whom he described as "hungry," "homeless," and "crazy people," who were connected to the Georgian police.  Shea stated that it was "[s]cary to think about . . . people wanting Alexander back."  Nishnianidze responded, "[I]t's very hard for, for you, okay?"

-4-

Near the end of the conversation, Nishnianidze told Shea that if the biological mother "don't receive money I don't know what will be happened." He told Shea to "be silence" and "not to make noisy." Nishnianidze advised her to borrow the $50,000 from a bank or from friends. The call ended when Shea told Nishnianidze she would discuss the matter with Finfer.

Later that day, Nishnianidze called again and spoke to Finfer, who recorded the call. Nishnianidze repeated that the biological family wanted $50,000 and encouraged Finfer to promptly pay whatever he could. Nishnianidze first said that his family in Georgia was in danger, then stated "maybe they will call you or come here I don't know what they can do."

Finfer told Nishnianidze that he was worried and asked, "Are you telling me that you're gonna take our child?" Nishnianidze responded, "Ah, I don't know what will be happen." Finfer concluded the call by telling Nishnianidze he would call him in New York the following week.

On February 3, Nishnianidze left a message at the couple's home asking them to call him at his Brooklyn residence. Finfer returned the call. In this recorded conversation, Nishnianidze asked, "What you decide?" Finfer told him that they had decided not to pay. Nishnianidze responded, "I think it would be . . . worse for me and ah, also for your family." Nishnianidze

told Finfer that the biological family knew Finfer and Shea's address and could send someone to the home.  He continued:

> They can take the child from yard or and they'll ah, request ah, twice more money.  Or they can I don't know what they can do, everything they can do. . . .
> They can find ah, another people which can come not to make photos but to take child. And then you, you, you, you will, you will not ah, know what we do when it would be happen because they don't warn you. . . .
> They know address they will take ah, after one month, two months, five months, ah, one year I don't know, which time it would be happen . . . . [They told me to] warn them, that we will take the child ah, or something we will do it then.

Finfer stated he was concerned for his son's safety, and Nishnianidze again advised against going to the police or telling anyone about the situation.  He stated, "If you are afraid for [Alexander] and his life in this case you must do right for son; you must pay."  Nishnianidze concluded by saying Finfer should call him within one week if he decided to pay.

Finfer called Nishnianidze the next day and stated that he was afraid for himself and his family and had decided to pay. Over the next two weeks, Finfer and Nishnianidze spoke five times regarding the exchange of money.  They agreed to meet at Boston's South Station to exchange $38,000.

In his final phone call on the evening of February 17, 1999, Nishnianidze told Finfer that he was sick and could not go to Boston to pick up the money.  He said Finfer could send the money

directly to the birth mother, but stated that he believed he could be arrested and did not want to touch the money.

### D.  FBI Questioning

On the morning of April 6, 1999, two New York FBI agents and a New York City Police Department detective went to the Manhattan apartment where Nishnianidze was staying.  FBI agents in Boston had requested that they locate Nishnianidze, interview him and obtain any photographs or videotapes in his possession of children whose adoptions he had processed.

When they arrived at the apartment between 8:00 and 8:30 a.m., the agents knocked and identified themselves.  Nishnianidze opened the door and they entered into a one-room apartment with a bed and two additional mattresses on the floor.  Nishnianidze appeared to have been sleeping when he answered the door, and the agents observed Nishnianidze's son on a mattress on the floor where he had been sleeping and where he remained throughout the interview.

The agents (including one Russian speaker) informed Nishnianidze that they were investigating his contacts with a Massachusetts family and interviewed him for thirty to forty-five minutes.  Nishnianidze talked about his involvement in international adoptions and his contacts with Finfer and Shea, and then answered follow-up questions.  The agents asked Nishnianidze if he had any photographs or videotapes of the adopted children.

An agent accompanied Nishnianidze as he searched the apartment and produced the video of Alexander. The agents and detective were all armed, and while Nishnianidze searched for the video, the detective removed his snub-nosed handgun from its holster and held it behind his back, reholstering it when the search was complete.

At some point during the interview, Nishnianidze's roommate arrived at the apartment. The detective asked him to wait in the hallway while the interview was completed and he agreed to do so. After giving Nishnianidze a receipt for the videotape and a birth announcement relating to another adoption, the interview ended.

### E. Arrest and Pre-trial

Nishnianidze was arrested on May 17, 1999. He was charged with four counts: (1) transmitting an interstate threat with the intent of extorting $50,000 in violation of 18 U.S.C. § 875(b); (2) transmitting an interstate threat in violation of 18 U.S.C. § 875(c); (3) traveling in interstate commerce to perform acts of extortion in violation of 18 U.S.C. § 1952; and (4) using an interstate facility to perform acts of extortion in violation of 18 U.S.C. § 1952.

Before trial, Nishnianidze made a motion to suppress his April 6, 1999 statements to the FBI agents. After an evidentiary hearing, the district court denied the motion.

**F. Trial**

The government's case at trial included the recorded telephone conversations between Nishnianidze and Shea and Finfer. Finfer and Shea testified about their conversations with Nishnianidze as well as their subjective fear that their son was in danger. An FBI agent described her interview of Nishnianidze in Manhattan, including his statement that he believed he was committing extortion.

Nishnianidze testified in his defense. He said he never intended to extort money, but was trying to make Finfer and Shea aware of the danger he was facing from Alexander's biological family in Georgia. Nishnianidze suggested that he wanted the couple to help him demonstrate fear of persecution so he could receive political asylum. Nishnianidze also stated that Finfer was playing "games" with Nishnianidze, and Nishnianidze simply joined the game, although he never actually intended a kidnapping.

The jury found Nishnianidze guilty on all four counts. He was sentenced to fifty-seven months imprisonment followed by two years of supervised release. He was also ordered to pay a special assessment of $400. This timely appeal followed.

## II. Discussion

### A. Motion to Suppress

Nishnianidze challenges the district court's denial of his motion to suppress. We review the district court's factual

determinations for clear error and its legal conclusions de novo. United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000).

"[A] person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first" receive Miranda warnings. Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). In determining whether a defendant was in "custody" when interrogated, "a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on the freedom of movement of the degree associated with a formal arrest." Id. (quotation omitted); accord United States v. Fernández-Ventura, 132 F.3d 844, 846 (1st Cir. 1998).

The officer's subjective belief is irrelevant; the inquiry is "how a reasonable man in the suspect's position would have understood his situation." Stansbury, 511 U.S. at 323-24. Among the factors to consider are "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987) (quotation omitted).

Considering all the circumstances, we hold that the district court did not err in denying Nishnianidze's motion to suppress. Admittedly, there are some factors in favor of suppression, including the fact that the interview took place early in the morning and was administered by three agents in a small area. Additionally, Nishnianidze was never told he was free to leave. On the other hand, Nishnianidze was interviewed at the place where he was staying; he was therefore familiar with the surroundings. The interview was forty-five minutes or less -- not exceptionally long. Cf. Fernández-Ventura, 132 F.3d at 848 (finding that the duration of the interrogation, on its own, is not a determinative factor).

The agents did not make physical contact with Nishnianidze or restrain his movement. At the hearing, Nishnianidze's son testified that he saw one of the detective's gun when it was briefly unholstered. However, there is no evidence that Nishnianidze saw the weapon or felt it restrained his movement in any way. Finally, Nishnianidze's son testified that Nishnianidze was told by the Russian-speaking agent that if he cooperated and agreed with the agents he would not be arrested. Nishnianidze asserts that he was confused and felt pressured to speak. This argument fails because the district court heard the son's testimony regarding the agent's behavior, and was in the best position to judge its credibility. The district court's factual

finding that the son's story was implausible is not clearly erroneous.  In all, there was not the "restraint on movement of the degree associated with a formal arrest," and Nishnianidze's motion to suppress his statements was properly denied.  See Stansbury, 511 U. S. at 322; cf. United States v. Lanni, 951 F.2d 440, 443 (1st Cir. 1991) (finding no clear error in determining that defendant was not in custody where she was interviewed and asked to provide handwriting samples by two agents for four hours in a "tense atmosphere").

### B.  Sufficiency of the Evidence

Nishnianidze asserts that the government failed to present sufficient evidence to sustain a conviction under 18 U.S.C. § 875(b)[1] and (c)[2] and 18 U.S.C. § 1952 (the "Travel Act").  In assessing a challenge to the sufficiency of the evidence, we "review the record to determine whether the evidence and reasonable

---

[1]     Whoever, with intent to extort from any person . . ., any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 875(b) (2003).

[2]     Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 875(c).

-12-

inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt that the defendant [was] guilty as charged." United States v. Sullivan, 85 F.3d 743, 747 (1st Cir. 1996) (quotation omitted). "An appellate court plays a very circumscribed role in gauging the sufficiency of the evidentiary foundation upon which a criminal conviction rests." United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998). We are mindful that the jury's duty is to assess credibility, and it may accept or reject, in whole or in part, any testimony. United States v. Mena-Robles, 4 F.3d 1026, 1031 (1st Cir. 1993).

### 1. Threats Transmitted Via Interstate Communication

To convict under § 875, the government had to prove that the defendant intended to transmit the interstate communication and that the communication contained a true threat. See United States v. Whiffen, 121 F.3d 18, 20 (1st Cir. 1997) (quoting United States v. Darby, 37 F.3d 1059, 1066 (4th Cir. 1994)). A true threat is one that a reasonable recipient familiar with the context of the communication would find threatening. Id. For a conviction under § 875(b), the government also had to prove that the threat was transmitted with the specific intent to extort money or a thing of value. See United States v. Himelwright, 42 F.3d 777, 783 (3d Cir. 1994).

-13-

A reasonable jury could find that Nishnianidze transmitted a threat in interstate commerce with the intent of extorting money. The jury heard Nishnianidze's telephone conversations, specifically the interstate telephone call of February 3 in which Nishnianidze stated that not paying the money would be "worse for me and ah, also for your family." He told Finfer that "[t]hey can take the child from yard," and warned that Finfer could never be safe because "they" could act at any time in the future. Nishnianidze finished by saying, "If you are afraid for [your son] and his life in this case you must do right for your son, you must pay."

The jury also considered the circumstances leading up to this conversation: Nishnianidze appeared in Boston out of the blue after nearly three years; went to the family's home and videotaped the child; and began a series of phone calls to the family discussing the danger posed by the biological family (who were referred to as "crazy people") and the need to pay $50,000 to avoid harm to either Nishnianidze's family or Alexander.

Nishnianidze asserts that he was simply warning the family and cannot be convicted because he never threatened to personally kidnap Alexander. His argument fails. Nishnianidze told Finfer and Shea that the only way to ensure their son's safety was to pay him $50,000. Thus, Nishnianidze acknowledged that he alone could prevent harm from befalling Alexander. His statements

-14-

in the final phone call that Finfer could send the money directly to the birth mother came after the threats had already been made. A jury could have found that Nishnianidze either controlled the biological family's actions or, more likely, that the story of the biological family was fabricated and the real danger was posed by Nishnianidze himself. There was ample evidence to support a finding that Nishnianidze's comments placed Finfer and Shea in immediate fear for their son's safety.

## 2. Criminal Conduct and Interstate Travel

To convict under the Travel Act, the government must show "(1) interstate travel or the use of an interstate facility; (2) with the intent to promote, manage, establish, carry on, or facilitate an unlawful activity" (here, violation of the Massachusetts extortion statute, Mass. Gen. Laws ch. 265, § 25 (2003)); and (3) "performance or attempted performance of acts in furtherance of the unlawful activity." Woodward, 149 F.3d at 65.

A reasonable jury could have found that Nishnianidze traveled from his home in Brooklyn, New York to Boston, Massachusetts in January 1999 and made interstate telephone calls in February 1999 intending to promote and facilitate extortion. Nishnianidze established contact with Finfer and Shea, came to their house and made a video of the family, and asked the couple for money for the biological mother. He continued to pressure the

family after he returned to New York.  There was ample evidence to support his conviction under the Travel Act.

### C.  Jury Instructions

#### 1.  "True" Threat

Nishnianidze argues that the district court erred in instructing the jury to consider whether the recipient felt threatened, rather than whether an objective speaker making the statements would believe a recipient would feel threatened.  Since no objection was made at trial, we review only for plain error. Fed. R. Crim. P. 52(b).  We evaluate the error in light of the record as a whole.  United States v. Smith, 278 F.3d 33, 38 (1st Cir. 2002).  Nishnianidze must demonstrate that the error was plain and that it affected his substantial rights.  United States v. Olano, 507 U.S. 725, 732 (1993); accord United States v. Tom, 330 F.3d 83, 93 (1st Cir. 2003).  This court will not correct a forfeited error unless the error "seriously affects the fairness, integrity or public reputation of judicial proceedings."  Olano, 507 U.S. at 732 (quotation omitted).

"True threats" are not protected by the First Amendment. United States v. Fulmer, 108 F.3d 1486, 1492-93 (1st Cir. 1997). A defendant may be convicted for making a threat if "he should have reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it is made."  Fulmer, 108 F.3d at 1491;

-16-

see also United States v. Whiffen, 121 F.3d 18, 21 (1st Cir. 1997)

(applying Fulmer to § 875(c)).  While the fact-finder may consider

other evidence, including the effect of the statement on the

recipient, the ultimate standard is an objective one -- whether a

reasonable person would understand the statement to be threatening.

Fulmer, 108 F.3d at 1491.  Nishnianidze asserts that the judge

improperly instructed the jury to consider the recipient's state of

mind when determining whether a threat was made.

Although the district court first (incorrectly) stated

that the threat was determined by the recipient's reaction, the

instruction later clarified that the burden is on the government to

show that a reasonable speaker would have understood the statement

to be threatening.[3]  We find no plain error in the district court's

---

[3]  The district court charged:

A communication contains a threat to kidnap another
person if it is made under circumstances such that an
ordinary reasonable recipient of the communication would
interpret it as a true threat of injury or kidnapping.
With respect to this element you may consider the
circumstance under which the statement was made,
including the kind of statement made, the place where it
was made, how it was spoken, and its context with respect
to the surrounding circumstances.  You may also consider
the language the defendant used and the reaction of the
person to whom the communication was addressed.  The
government is not required to prove that the defendant
subjectively intended the recipient to understand the
communication as a threat, nor that the defendant
intended or was able to actually carry out the threat
contained in the communication.  But the government must
prove that the defendant could reasonably have foreseen
that the communication would be taken as a threat by the
listener.

-17-

instruction.  At most, the district court misspoke at the beginning of the instruction.  The misdescription or omission of an element of a crime does not necessarily constitute plain error.  <u>Neder</u> v. <u>United States</u>, 527 U.S. 1, 9-10 (1999).

The evidence was overwhelming that Nishnianidze should have known that the threats would frighten the victims.  Finfer and Shea told Nishnianidze they were frightened and Nishnianidze acknowledged that it was hard for them to hear what he said.  Nishnianidze told them that someone could take their child at any time and told them not to go to the police.  A reasonable person who made these statements would understand them to be threatening.  Any error in the instruction did not affect Nishnianidze's substantial rights.

### 2.  Entrapment

Nishnianidze challenges the district court's denial of his request for an entrapment instruction.  We apply plenary review to that decision.  <u>United States</u> v. <u>Rodríguez</u>, 858 F.2d 809, 812 (1st Cir. 1988).  "[A]n accused is entitled to an instruction on his theory of defense so long as the theory is a valid one and there is evidence in the record to support it."  <u>Id.</u>  In making this determination, a court may not weigh the evidence, make credibility determinations, or resolve conflicts in the proof.

---

(Emphasis added).

-18-

United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998). Rather, we consider whether "there is record evidence which fairly supports the claims of both government inducement of the crime and defendant's lack of predisposition to engage in it." Rodríguez, 858 F.2d at 814.

An improper "inducement" consists of the opportunity plus something else like excessive pressure, dogged persistence, or the government's taking advantage of an alternative, non-criminal type of motive. Gendron, 18 F.3d at 961; United States v. Joost, 92 F.3d 7, 12 (1st Cir. 1996). "[I]t is not enough simply that the government afforded the defendant the opportunity for commission of the offense." Rodríguez, 858 F.2d at 813.

Nishnianidze argues improper inducement resulted when the FBI suggested questions for Finfer and Shea to pose to Nishnianidze and monitored the case. We think this is a prime example of the government simply giving a suspect the opportunity to commit a crime: the FBI did not design or initiate the plan, Finfer and Shea simply asked open-ended questions and Nishnianidze provided the incriminatory details. Nishnianidze mentioned the possible harm to Alexander and the need to pay $50,000 to ensure his safety. Finfer and Shea (as governmental agents) did nothing to pressure Nishnianidze -- indeed, the most serious threats came when Finfer stated that they would not pay. Cf. id. at 815 (finding that defendant made a sufficient showing of government inducement where

-19-

the government actor "designed the plan, created the opportunity for defendant's participation, made the initial approach, solicited defendant forcefully, and displayed dogged insistence until [defendant] capitulated").

As to predisposition, we remove the government's improper inducement and "ask how the defendant likely would have reacted to an ordinary opportunity to commit the crime." Gendron, 18 F.3d at 962. Factors to consider in assessing whether the defendant was predisposed to commit to crime charged are:

> (1) the character or reputation of the defendant; (2) whether the initial suggestion of criminal activity was made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant showed reluctance to commit the offense, which was overcome by the governmental persuasion; and (5) the nature of the inducement of persuasion offered by the Government.

Gamache, 156 F.3d at 9-10.

Nishnianidze has not shown a lack of predisposition. He initiated contact with Finfer and Shea, sought to profit from his threats, showed no reluctance to the crime (his hesitancy in collecting the money at the end came too late -- the threats had already been communicated), and there was little, if any, inducement by the government. As Nishnianidze has not shown either government inducement or lack of predisposition, the district

-20-

court's refusal to instruct the jury on an entrapment defense was proper.

### D.  Pro Se Motions

In a pro se brief, Nishnianidze maintains that he was denied effective assistance of counsel.  This claim requires resolution of factual issues, as appellant must demonstrate that counsel's performance was constitutionally deficient and that the deficient performance prejudiced the defense.  See Strickland v. Washington, 466 U.S. 668, 687 (1984).  We have held that "fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court." United States v. Mala, 7 F.3d 1058, 1062 (1st Cir. 1993). Nishnianidze's claim of ineffective counsel is therefore dismissed without prejudice to appellant's right to litigate the claim in an application for post-conviction relief.  See id. at 1063.

Nishnianidze also filed a pro se motion to dismiss based on the Vienna Convention, an issue raised for the first time on appeal.  His argument is not developed and therefore waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  His allusion to prosecutorial misconduct fails for the same reason.  Id.

### III.  Conclusion

Finding no merit in Nishnianidze's appeals, we affirm the decision of the district court.

**<u>Affirmed</u>**.