# United States Court of Appeals
## For the First Circuit

No. 12-1149

UNITED STATES OF AMERICA,

Appellee,

v.

JEFFREY L. CLEMENS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Howard, Circuit Judges.

Matthew S. Cameron on brief for appellant.
Mark T. Quinlivan, Assistant United States Attorney, and
Carmen M. Ortiz, United States Attorney, on brief for appellee.

December 10, 2013

**LYNCH, <u>Chief Judge</u>**.  We are invited in this case to change our circuit law on the type of intent needed by a defendant to communicate "true threats" under 18 U.S.C. § 875(c).  We note there is a circuit split on the question of intent in the aftermath of <u>Virginia</u> v. <u>Black</u>, 538 U.S. 343 (2003).  The issue was not raised before the trial court, and on plain error review we see no reason to depart from this circuit's law that an objective test of defendant's intent is used from the defendant's vantage point under § 875(c).  <u>United States</u> v. <u>Whiffen</u>, 121 F.3d 18, 21 (1st Cir. 1997).

On May 11, 2011, a jury convicted Jeffrey Clemens of two counts of sending threats to injure another across state lines in violation of 18 U.S.C. § 875(c).  He was sentenced to five years of imprisonment.  The threats were in two emails, one sent to Stephen Pfaff, the opposing counsel and defendant in a lawsuit that Clemens had filed, and the other to Patricia Vinchesi, the Town Administrator of Scituate, Massachusetts, which was also a defendant in that suit.

Clemens appeals from his conviction, primarily arguing that the district court gave incorrect jury instructions on the meaning of the term "threat."  He also argues that there was insufficient evidence to support his conviction and that the district court had erred in denying his pre-trial motion to dismiss his indictment.  Pertinent to most of Clemens's claims of error is

-2-

his argument, made for the first time on appeal, that the Supreme Court decision in <u>Black</u> required the jury to find that he <u>subjectively</u> meant to threaten Pfaff and Vinchesi and that it was insufficient to measure his intent by reference to an objectively reasonable person.

We affirm.

I.

We draw the facts primarily from the parties' pleadings and the trial record. Because Clemens challenges the sufficiency of the evidence, we describe the evidence in the light most favorable to the jury verdict. <u>See</u> <u>United States</u> v. <u>Soto</u>, 720 F.3d 51, 54 (1st Cir. 2013).

On May 12, 2005, Clemens was arrested in Scituate, Massachusetts, and that set off the chain of events which eventually resulted in the federal indictment in this case. That day, the Scituate police department had received a call from a town resident that Clemens was trespassing on the grounds of her home. The police arrested Clemens for trespassing, after he had already left the private residence, and charged him with disorderly conduct and impersonating a private investigator, inter alia. <u>See</u> <u>Clemens</u> v. <u>Town of Scituate</u>, No. 07-10845-RGS, 2009 WL 1448807, at *1 (D. Mass. May 22, 2009). A jury convicted Clemens of the disorderly conduct count, for which he served six months in state prison, although that conviction was later overturned. (The reason is not

in the record.)  He also had admitted that there were sufficient facts to prove his guilt for impersonating an investigator, for which he received a six month suspended sentence.

In May 2007, Clemens filed a § 1983 lawsuit, pro se, in federal court against the Town of Scituate (Town), two local police officers, the Town resident who had accused him of trespassing and that resident's husband, asserting that the arrest had been without probable cause, in violation of the Fourth Amendment, and pendent common law tort claims.  See id. at *2.  Pfaff was the attorney who represented the Town and the police officers in this § 1983 case. On January 9, 2009, Pfaff filed a motion for summary judgment, arguing that Clemens had no legal basis for his claims.  The district court granted summary judgment as to all federal claims on May 22, 2009, declining to exercise jurisdiction over the pendent state law claims.  See id. at *3.

Again proceeding pro se, on October 27, 2009, Clemens filed another lawsuit in federal court against the Town, the Scituate police officers, and additional defendants, including Pfaff; this time Clemens sought damages for malicious prosecution and "willful negligence."  The case was assigned to a different federal district court judge.

Pfaff again represented the Town, some individual defendants, and himself in this second lawsuit.  On March 5, 2010, Pfaff moved to dismiss the lawsuit as to himself.  In response,

Clemens sent Pfaff the following email three days later, on March 8, 2010 at 10:25 p.m.[1]:

> Dearest Mr. Pfaff:
>
> The judge to whom you just motioned, William G. Young, by the way [perhaps you knew already], graduated Harvard Law with Alan Alexander, long and dear friend and associate to Ronald Bass, credited author of the movie Rain Man which you took it upon yourself to refer to in your recent motion before him [Young]. Only thing is, Mr. Bass went to Harvard Law, too, and graduated but one year before Mr. Young.
>
> Gee, do you suppose they knew each other? Exchanged notes? Took Civil Procedure together?
>
> If you want to file crap like your Rule 12 motion, fine. Apparently, the truth means nothing to either you or the police [obviously, you motioned to avoid discovery]. Given the recent Stearns disqualification [which you failed to mention in your motion], I believe you are playing a dangerous game, a very dangerous game. I have every hunch someone is going to get hurt. At this point [years of police/court bullshit, and your crap], I'm rather hoping someone will [deserving it, of course].
>
> Have you ever been punched in the face? Well, I was, at PCCH,[2] thanks to O'Hara and Moynahan and now, frankly, I rather hope you experience that same thrill someday, figuratively or otherwise, maybe even see one of your

---

[1] The underlined portions of the email are those that Pfaff identified as threatening at trial. The emphasis that was in Clemens's original email has been removed. The bracketed material appears as such in the original.

[2] PCCH presumably refers to the Plymouth County House of Correction.

-5-

"clients" go to prison, you get disbarred, "taken to a chop shop on Staten Island", whatever.

There was never any "argument" between O'Hara and I on May 12, 2005. He is one lying son-of-a-bitch and you knew it on September 17, 2008 when you invited him to sit in on the Goyette deposition. And you knew O'Hara was going to lie at the September 18, 2008 "trial". And you now expect to let your misconduct be a basis for a Rule 12 motion? What, I pled to "sufficient facts"? Bullshit. There was never any sufficient facts to begin with much less plea to. You and your people systematically BUTTFUCKED me and you knew it, too.

I will say it now, once. I, at this point, will not ever allow the SPD and HDC to get away with what they have done. They're an affront to all that is [pretended to be] American Democracy and Justice, as are you. One way or another, I will have my day in court or the back alley [hint, hint, veiled threat potential here].

You do be careful now, you hear? And by all means, run to your FBI friends, I would encourage it. After all, perjury is a federal offense too, especially when the victim is from out-of-state. Besides, it [you running to the feds] will give me a chance to make my case. Yeah, go ahead and call the FBI and say something like "Oh, Mr. Clemens [']threatened me['] in an email last night". Yeah, right. Five years, and this ain't over. And do you know why? I mean, really, why is this whole thing not over? Because of people like you, who crossed the line [in September 2008], and O'Hara and Moynahan, who crossed certain lines, too. You, at this point, I assure you, will get what you deserve. Pow! Bang! Splat! I really, truly and sincerely wish you were dead.

I am very much looking forward to putting you in your place, Mr. Pfaff. You disgust me. You

-6-

are absolute filth [proof positive that a suit and tie ultimately doesn't not make a person "good" or "respectable"].  Yeah, remember Stearns and the whole Laveroni default? Sure you do.  And surely, you will pay the price some day for the many years of incarceration I had to endure BECAUSE OF YOU Mr. Hired in 2007 Over A Year Before The September 2008 Trial That Gave You Summary Judgment Pfaff.

Oh, how I wish a 10-ton I-beam would fall on you, O'Hara, Rooney and Shelly[3] right now.  Splat!  Boy, would I love to see that!

Perhaps someday I will [or, at least, an equivalent experience].  As far as I am concerned, neither you nor your partners in crime deserve your freedom right now.

From now on, be sure and watch your backside, Mr. Pfaff.  God may step up to the plate at any moment.  I dunno, I got this feeling someone's going to get hurt REAL BAD.  And it ain't gonna be me.

Here's to Law and Order.  And yes, you can expect a full briefing from me in the coming days addressing your truth-twisting truth-burying masterpiece of a motion.  Rationalize all you want but come Judgment Day you've had it.

Jeffrey Clemens

(emphasis added).

Clemens also sent this email as an attachment to Patricia Vinchesi, the Scituate Town Administrator, at 10:34 p.m. on March 8, 2010, with the message "Mr. [sic] Vinchesi: You all might be

---

[3]  Sergeant Michael O'Hara and Lieutenant John Rooney are Scituate police officers and defendants in Clemens's lawsuits. Shelley Laveroni had accused Clemens of trespassing and is also a defendant in his lawsuits.

-7-

digging yourself a grave. Jeffrey." Vinchesi was not a defendant in either of Clemens's lawsuits.

Pfaff read Clemens's email the following morning on March 9. He testified in this case that he had read the email as a "personal physical threat." As a result, he sent his wife a photograph of Clemens, which he had in his case file, because he was worried that Clemens would show up at the child care center where she worked. Pfaff sent this same photograph to the Chief of Police in the town where he lived because he "was concerned for [his] physical safety" and asked for extra patrol cars to come by his house.

That same day, Pfaff forwarded the email to an FBI agent whom he knew. He also sent Clemens's email to the courtroom clerk assigned to the civil lawsuit.[4]

Like Pfaff, Vinchesi also opened the email from Clemens on March 9. She testified that she "got very scared" considering that she was the only person to receive an attachment with Clemens's email to Pfaff, and the message addressed to her was "You all might be digging yourself a grave." She forwarded the email to Scituate's Chief of Police and also met with him in person. The Chief gave her a photograph of Clemens. Vinchesi said it was "very

---

[4] After a hearing on April 1, 2010, the district court dismissed Clemens's second civil suit with prejudice "due to [Clemens's] abuse of litigation process through his scurrilous and threatening communications."

-8-

important to know what [Clemens] looked like, [in case] he should show up in [her] office" in the Scituate Town Hall, which was open to the public and had no security measures.

FBI Agent Thomas Greenwalt testified that he had arrested Clemens on March 17 in Huron, Ohio, where he then lived with his parents. After being advised of his rights, Clemens admitted that he had sent the emails to Pfaff and Vinchesi while he was in Huron. Greenwalt testified that Clemens had characterized the emails as "strongly worded" and "rhetoric." Clemens also said to Greenwalt that he did not use his best judgment in sending them although he asserted that "[f]eeling like doing something is not the same as actually doing it."

## II.

On April 14, 2010, a grand jury charged Clemens with two counts of "Interstate Transmission of Threat to Injure" in violation of 18 U.S.C. § 875(c), based on the emails that he had sent to Pfaff and Vinchesi. Section 875(c) punishes "[w]hoever transmits in interstate . . . commerce any communication containing any threat . . . to injure" another person.

Clemens moved to dismiss the indictment, arguing in part that the emails are, as a matter of law, protected speech under the First Amendment and do not contain "true threats," which are outside the scope of First Amendment protection.

On April 22, 2011, the district court denied Clemens's motion, noting that whether a statement is a threat under § 875(c) is usually an issue of fact for the jury. It applied this circuit's objective test under which a statement is a threat if the sender[5] should have reasonably foreseen that the recipient would interpret it as such.

While acknowledging Clemens's point that some of the statements in the email express hopes or wishes, such as Clemens's "wish" that a "10-ton I-beam" fall on Pfaff, the court observed that these wishes are "hardly of a benign nature" and are accompanied by statements that reference Clemens's intent to actually "do something" to Pfaff. Given the context of Clemens's communications -- highly contentious litigation -- the court

---

[5] The court, relying on model jury instructions, also instructed that the test for a threat was objective <u>as to the recipient</u>, because a true threat is one that a "reasonable recipient familiarized with the context of the communication would find threatening." <u>United States</u> v. <u>Clemens</u>, No. 10-10124-DPW, 2011 WL 1540150, at *2 (D. Mass. Apr. 22, 2011) (quoting <u>United States</u> v. <u>Nishnianidze</u>, 342 F.3d 6, 15 (1st Cir. 2003)) (internal quotation mark omitted).
    The government has argued that the court erroneously raised the government's burden proof when it said that the objective test applies to both the sender and the recipient. The government contends that the test in this circuit, as articulated in <u>United States</u> v. <u>Fulmer</u>, 108 F.3d 1486 (1st Cir. 1997), and <u>United States</u> v. <u>Whiffen</u>, 121 F.3d 18 (1st Cir. 1997), is an objective standard only from the perspective of the sender. We do not address the government's objection, which is not necessary to the outcome of this appeal. The government does not claim to have called this issue to the attention of the trial judge.

concluded that a "reasonable jury could find that [Clemens's] statements constituted a threat."

During a three-day trial in May 2011, Pfaff, Vinchesi, and FBI Agent Greenwalt testified on behalf of the government and Clemens's emails to Pfaff and Vinchesi were submitted as evidence. The defense did not call any witnesses, and Clemens chose not to testify.

At trial, Clemens had admitted that: 1) the emails were sent in interstate commerce, traveling from Ohio to Massachusetts, where Pfaff and Vinchesi received them; and 2) he intended to send the emails. So, the only issue left for the jury under § 875(c) was whether the emails contained a threat to injure someone.

In closing, the defense argued that it is not reasonable to construe these emails as literal threats, characterizing Clemens as an "aggrieved" person who was just blowing off steam because he felt he had been treated unfairly in the state criminal justice system and was frustrated with the progress of his related civil suits. The defense also focused on the language of the emails, saying that Clemens's "cartoonish" and "self-referential" statements were not meant to be taken literally.

Clemens proposed several jury instructions to the district court, including one on the meaning of a "threat."[6]

---

[6] The defendant proposed these instructions, as pertinent to this appeal:

The district court instructed the jury that it had to determine whether the emails sent to Pfaff and Vinchesi contained

---

The government must prove beyond a reasonable doubt that the statements made constitute a true threat under federal law. A threat is a statement made in a context or under such circumstances that a reasonable person would foresee that the statement would convey to the recipient a seriousness of purpose to inflict bodily harm and the apparent prospect of execution.

A true threat is a statement expressing an intention to assault someone in such a way as could reasonably induce fear. A true threat is to be distinguished from idle, careless talk, exaggeration, or something said in a rude, aggressive, or offensive manner.

You must determine whether the government has proved beyond a reasonable doubt that Mr. Clemens's alleged statements were a true threat when judged in their context, that is, whether the government has proved beyond a reasonable doubt that the statements were a serious expression of intent to inflict injury and not merely a vehement or offensive expression of hyperbole or argument against a government official.

This means you should consider the statement in light of the entire factual context, including:

- The surrounding events;
- The place from where the statements were made;
- The circumstances leading up to Mr. Clemens's statements;
- The way in which Mr. Clemens chose to communicate the statements;
- The effect of the statements on the recipients;
- The context of the statements within the emails sent;
- Whether on their face and in the circumstances in which they were made the statements were so unequivocal, unconditional, and specific as to convey to the recipients a gravity of purpose and apparent prospect of execution; and
- Any prior interactions between Mr. Clemens and Mr. Pfaff and/or Ms. Vinchesi.

-12-

a threat to injure, explaining that the "general definition of a threat, is a communicated intent to inflict harm or loss on another." The court also instructed the jury to use an objective test for identifying a threat under § 875(c), saying in part:

> [W]e are looking for a societal judgment about whether or not a person sending such a communication would understand that it was a threat and that a person receiving such a communication would understand that they have been threatened. You become the embodiment of society here in making this kind of judgment about deciding according to our ordinary notions of behavior and responsibility among ordinary people in our society at this time, not somebody who is overanxious or over-concerned, not somebody who is oblivious to communications. But the ordinary person who receives this or sends it, what would they believe this to be, a threat or not?

Clemens objected to the jury instructions, arguing that the court should have used his proposed instructions on threats because they "add[] an additional protection" of describing threats as "true," and because they say that the threat of injury must be imminent.

Clemens did not object to the court's refusal to instruct the jury on "ambiguous statements" or its application of an objective, as opposed to subjective, standard to the issue of intent. He raises both of these arguments for the first time on appeal. Nor did Clemens ever challenge the sufficiency of the evidence at trial.

After the court had already given its instructions it declined to add Clemens's definition of a threat, saying that "[it] add[s] dimensions to the case that are nowhere to be found in the First Circuit law."

After deliberating for just under two hours, on May 11, 2011, the jury found Clemens guilty of both counts of sending threats to injure in interstate commerce. Clemens timely appealed.

III.

A.      Jury Instructions

Clemens's only preserved challenge to the jury instructions is that the court did not use his language on a "true threat." He suggests that the court's instructions did not distinguish between language that is protected by the First Amendment and "true threats." Clemens's own proposed instructions, it is worth pointing out, utilized an objective test, referring to "an intention to assault someone in such a way as could reasonably induce fear." (emphasis added).

We review preserved claims of legal error in jury instructions de novo. See United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012). "[A] district court's refusal to give a particular instruction constitutes error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." United States v.

-14-

<u>Symonevich</u>, 688 F.3d 12, 24 (1st Cir. 2012). "An error mandates reversal only when it is prejudicial based on a review of the entire record." <u>Id.</u>

The district court did not err in not adopting Clemens's instructions. To start, Clemens's proposal contains incorrect statements. His instructions ask the jury to consider whether his statements "were so unequivocal, unconditional, and specific as to convey to the recipients a gravity of purpose and apparent prospect of execution." We have rejected any requirement that threats be "unequivocal, unconditional, and specific." Rather, "use of ambiguous language does not preclude a statement from being a threat."[7] <u>United States</u> v. <u>Fulmer</u>, 108 F.3d 1486, 1492 (1st Cir. 1997); <u>see</u> <u>id.</u> at 1490, 1492 (holding that a jury could find the phrase "[t]he silver bullets are coming" represented a threat despite evidence of that phrase's potential innocuous meaning); <u>see also</u> <u>United States</u> v. <u>Turner</u>, 720 F.3d 411, 424 (2d Cir. 2013) (commenting that the Second Circuit has "affirmed convictions for threats that were both conditional and inexplicit").

There are other errors in Clemens's instructions, but we need not parse them because the district court's jury instructions accomplish that which he requested: distinguishing real or "true"

---

[7] Although <u>Fulmer</u> reviewed a conviction under 18 U.S.C. § 115(a)(1)(B), a different statute that proscribes threats to "assault, kidnap, or murder" United States officials, this court has treated the term "threat" or "threaten" as having the same meaning in both criminal statutes. <u>See</u> <u>Whiffen</u>, 121 F.3d at 21.

-15-

threats from those that are not.  See Symonevich, 688 F.3d at 24 (holding that there is no error where the requested instruction is "substantially incorporated into the charge as rendered"). Clemens's submitted instructions asked jurors to evaluate statements "in their context" to distinguish a "true threat" from "idle, careless talk, exaggeration, or something said in a rude, aggressive, or offensive manner."

The district court accomplished the needed distinctions, but in more appropriate language:

> Now, there have been various adjectives that have been used by the parties in talking about this, "incendiary" and "excitable" and "bad judgment" and "not friendly" and "vehement" and "bad manners."  Those may or may not be ways to distinguish a threat under these circumstances, but you are not so much concerned about whether or not it was bad manners or vehement or excitable as to whether or not a reasonable person reading this would say that is a threat, and whether a reasonable person sending it would understand that is a threat. . . .
>
> Of course [in making that determination] you consider all of the circumstances.  Horseplay between kids using inflated language might, under some circumstances, not be considered a threat.  A kind of acting out might not be considered a threat.  But what you are focusing on is whether or not in our society at this time the communication of these words in this context would, by a reasonable person, be considered a threat, and that is what is at the core of this case.

As to Clemens's stated objections at trial, there was no error.

We turn to Clemens's arguments made for the first time on appeal. First, he argues that the court's definition of a threat, drawn from Black's Law Dictionary, misstates the law because it failed to include the statutory language of a threat "to injure." He mixes apples and oranges. The court had initially instructed the jury:

> At the guts of this case, I would suggest to you, and the thing that you are going to have to be concerned with is whether or not the communications . . . <u>contained a threat to injure someone</u>.
>
> Now, the law has been I think fairly specific about what a threat means in this setting. <u>The general proposition, general definition of a threat, is a communicated intent to inflict harm or loss on another.</u>

(emphasis added). The district court did not err at all when it explained to the jury that it was providing a general definition of the term "threat" immediately after it had instructed them of their particular task: deciding whether the emails contained a "threat <u>to injure</u>."

More significantly, Clemens argues that the district court erred when it told the jury to decide if a "reasonable person" sending Clemens's emails would understand them to be threats. He argues that the Supreme Court's 2003 decision in <u>Black</u> mandates a subjective intent test. To be more precise, the question under 18 U.S.C. § 875(c) is whether the government must prove only that a reasonable person would construe the words as a

threat, and need not prove as well that the defendant subjectively meant the words to be a threat. See United States v. Jeffries, 692 F.3d 473, 483-84 (6th Cir. 2012) (Sutton, J., dubitante), cert. denied, 134 S. Ct. 59 (2013).

Because Clemens never once raised this issue at trial, although it was clearly available to him, we review only for plain error,[8] United States v. LaPlante, 714 F.3d 641, 643 (1st Cir. 2013), which Clemens cannot establish. To do so, Clemens must show that: "(1) there was error; (2) the error was plain; (3) the error affected [his] substantial rights; and (4) the error adversely impacted the fairness, integrity, or public reputation of judicial proceedings." United States v. Caraballo-Rodriguez, 480 F.3d 62, 69 (1st Cir. 2007) (quoting United States v. Riggs, 287 F.3d 221, 224 (1st Cir. 2002)) (internal quotation mark omitted).

Before Black was decided, this court had addressed what test must be used to determine intent under true threat statutes. In Fulmer, involving a threat to a federal agent under 18 U.S.C. § 115(a)(1)(B), we framed the question. We noted the circuits

---

[8] Clemens argues that he did raise the subjective intent issue at trial when he objected to the jury instructions because he said that the term "true threat" is "language which derives from the Supreme Court." This argument is frivolous. His vague reference to Supreme Court precedent does not give the district court notice of the argument he now makes on appeal, which is based on a sentence in Black. Clemens mentioned neither Black nor subjective intent in his objection (or at any point during the trial). Moreover, Clemens's own proffered definition of a "true threat" applied an objective standard to intent.

-18-

agreed that the test was an objective one but that they "disagree[d] regarding the appropriate vantage point -- what a person making the statement should have reasonably foreseen or what a reasonable person receiving the statement would believe."  108 F.3d at 1491.  We concluded that "the appropriate standard under which a defendant may be convicted for making a threat is whether he should have reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it [wa]s made."  Id.

The question of whether the statute involved in this case, 18 U.S.C. § 875(c), required the government to prove specific intent -- that the defendant intended his communications to be received as a threat -- was addressed a few months later in Whiffen.  We rejected the argument that § 875(c) was a specific intent crime, described it as a general intent crime, and adhered to the Fulmer articulation.  Whiffen, 121 F.3d at 21.

Although not previously presented with this type of argument based on Black, since Black was decided in 2003 this court has continued to apply its objective defendant's vantage point test for determining intent in criminal threat cases.  See, e.g., United States v. Stefanik, 674 F.3d 71, 75 (1st Cir. 2012); United States v. Walker, 665 F.3d 212, 226 (1st Cir. 2011); United States v. Nishnianidze, 342 F.3d 6, 16 (1st Cir. 2003).

The core holding of Black is actually addressed to a different issue about the constitutionality of a Virginia law that

-19-

banned cross burning with an intent to intimidate, which contained a presumption as to intent.  A jury in Black had been instructed that the state must prove the defendant had the intent to intimidate any person and that specific intent was not at issue. The Supreme Court of Virginia held the statute unconstitutional on First Amendment grounds.  The United States Supreme Court, in a divided opinion concerned only with the statute's facial provision, which "treat[ed] any cross burning as prima facie evidence of intent to intimidate," Black, 538 U.S. at 347-48, remanded in part for further interpretation of that provision, id. at 367.  In its analysis, the Court said, "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  Id. at 359 (emphasis added).  It continued, saying "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death."  Id. at 360.  It is this first "means to communicate" language on which defendant's argument is based.  Even if the statement were only dicta, we must take Supreme Court dicta seriously.  See Mass. Delivery Ass'n. v. Coakley, 671 F.3d 33, 43 (1st Cir. 2012).

Of the courts of appeals to consider a subjective intent argument derived from this language in Black, most have rejected it.  See United States v. Martinez, No. 11-13295, 2013 WL 6182973 (11th Cir. Nov. 27, 2013); United States v. Elonis, 730 F.3d 321 (3d Cir. 2013); United States v. Nicklas, 713 F.3d 435 (8th Cir. 2013); Jeffries, 692 F.3d 473;[9] United States v. White, 670 F.3d 498 (4th Cir. 2012).  These courts have reasoned that the Black decision had no occasion to distinguish between subjective and objective standards for construing threats because (1) the Virginia law at issue required subjective intent; and (2) the prima facie evidence provision that the Court invalidated had no standard at all for intent, "allow[ing] convictions 'based solely on the fact of cross burning itself.'"  Jeffries, 692 F.3d at 479-80 (quoting Black, 538 U.S. at 365); see also Elonis, 730 F.3d at 329 (refusing to interpret Black as "invalidat[ing] the objective intent standard the majority of circuits appl[y] to true threats" because the

_____

[9]  Only the Black argument, on plain error review, is before us.  No argument is made to us that the language of the statute of conviction, construed in Whiffen, requires that we change our rule.  Only an en banc panel has authority to change this circuit's interpretation of § 875(c) absent a Supreme Court case on point.  See Downing/Salt Pond Partners, L.P. v. R.I. & Providence Plantations, 643 F.3d 16, 24 (1st Cir. 2011).
We are aware of Judge Sutton's opinion dubitante in Jeffries opining that the language of § 875(c) requires subjective intent and that most courts have gotten it wrong by imposing an objective intent test.  Importantly, he was clear that his interpretation of § 875(c) is not at all based on Black or the First Amendment.  See Jeffries, 692 F.3d at 483-86 (Sutton, J., dubitante).

Virginia statute "already required a subjective intent to intimidate").

These courts have also addressed the particular language in Black on which Clemens relies, in which threats are those statements where the "speaker means to communicate a serious expression of an intent to commit an act of unlawful violence." Rather than read the language as setting forth a subjective intent requirement, they have concluded that the sentence only requires the speaker to "intend to make the communication," not the threat. Elonis, 730 F.3d at 329; see Martinez, 2013 WL 6182973, at *5; Jeffries, 692 F.3d at 480; White, 670 F.3d at 508-09.

To date, only the Ninth Circuit has held that this language from Black imposes a subjective intent requirement in a criminal threat statute, 18 U.S.C. § 879(a)(3), which prohibits certain threats against presidential candidates and their families. See United States v. Bagdasarian, 652 F.3d 1113, 1117 (9th Cir. 2011). That holding is consistent with the Ninth Circuit's prior case law.[10] See id. at 1117-18 (observing that Black affirmed that circuit's dictum requiring subjective intent). In United States v. Parr, 545 F.3d 491, 500 (7th Cir. 2008), the Seventh Circuit did

---

[10] One Ninth Circuit panel has commented that the question is not whether a subjective or an objective test is required, since in its view a subjective test is required under 18 U.S.C. § 879(a)(3), but whether both are required. See Bagdasarian, 652 F.3d at 1117-18.

-22-

not decide the issue but suggested that an objective intent standard is "no longer tenable" after <u>Black</u>.

Here, we need only conclude that Clemens cannot show plain error. Even if there was any error, that error is not plain or obvious. Most circuits have rejected Clemens's argument and this court has applied an objective defendant vantage point standard post-<u>Black</u>. <u>Cf.</u> <u>United States</u> v. <u>Diaz</u>, 285 F.3d 92, 97 (1st Cir. 2002) (holding that defendant cannot establish plain error where law is unsettled both within and outside the First Circuit). Absent further clarification from the Supreme Court, we see no basis to venture further and no basis to depart from our circuit law.

As to the remaining prongs of plain error, we add that we have little doubt that if a subjective specific intent instruction had been given, the jury would have, on these facts, found such intent. Under either an objective or subjective standard, the jury evaluates the particular circumstances of a case to determine intent. <u>See</u> <u>United States</u> v. <u>Goodchild</u>, 25 F.3d 55, 60 (1st Cir. 1994) (observing, in a criminal fraud case, that direct proof of intent is rare and that the government "usually prove[s]" specific intent "by circumstantial evidence"). It is rare that a jury would find that a reasonable speaker would have intended a threat under the particular facts of a case but that a competent defendant did not. (This might occur, for example, if the defendant were

-23-

mentally handicapped.) The choice between an objective and specific intent requirement is likely to have a greater impact in circuits, like the Sixth but not like this circuit, which uphold criminal threat convictions based solely on the reaction of the reasonable listener. See Jeffries, 692 F.3d at 478, 480.

Finally, Clemens also argues for the first time on appeal that the district court erred in refusing to read his instruction on ambiguous statements. He again cannot show plain error where his instructions include errors of law, such as by saying "[t]he government must prove beyond a reasonable doubt that the statement was not ambiguous and that it clearly conveyed a threat to assault."

While he claims his instruction is drawn from Fulmer, it instead contradicts Fulmer, which said that ambiguous language does not prevent a statement from being a threat. 108 F.3d at 1492. So, under § 875(c) the government must prove beyond a reasonable doubt that a statement is a threat, but need not prove that the statement is unambiguous.

Clemens's proposed instruction also erroneously requires the government to prove a "threat to assault." (emphasis added). Section 875(c), however, prohibits a threat to injure. The "assault" language appears to come from § 115(a)(1)(B), which proscribes threats to "assault, kidnap, or murder" United States

-24-

officials.  The district court did not plainly err in rejecting an instruction riddled with legal error.

B.         Denial of Motion to Dismiss the Indictment

Clemens argues that the district court should have dismissed his indictment before trial because no reasonable jury could conclude his emails, as charged, communicated "true threats." We review his legal challenge to the indictment de novo.  United States v. Guerrier, 669 F.3d 1, 3 (1st Cir. 2011).  The argument is misplaced.

It is true that "statute[s] . . . which make[] criminal a form of pure speech[] must be interpreted with the commands of the First Amendment clearly in mind."  Watts v. United States, 394 U.S. 705, 707 (1969) (per curiam).  This is not a basis on which to take away from a jury the factual question of whether or not Clemens's emails conveyed true threats.  See United States v. White, 610 F.3d 956, 959 (7th Cir. 2010) (per curiam) (rejecting defendant's First Amendment argument to dismiss an indictment because "potential First Amendment concern[s] [are] addressed by the requirement of proof beyond a reasonable doubt at trial, not by a dismissal at the indictment stage").

"Whether a . . . [statement] constitutes a threat is an issue of fact for the trial jury," involving assessments of both credibility and of context.  Fulmer, 108 F.3d at 1492 (quoting United States v. Malik, 16 F.3d 45, 49 (2d Cir. 1994)) (internal

quotation marks omitted); see, e.g., White, 610 F.3d at 962 (noting that an indictment need not lay out all of the government's evidence that defendant's speech was criminal solicitation); Nishnianidze, 342 F.3d at 15 (considering circumstances leading up to alleged threatening statements in determining whether a reasonable jury could convict the defendant under a criminal threat statute).

Clemens argues his case is different because his statements were nothing more than "generalized fantasy," "sarcastic[]," and "cartoonish and hyperbolic."[11]  Not so.  In Whiffen, a defendant also offered a non-threatening interpretation of the statements that served as the basis for his indictment, and we held that the choice among interpretations was an issue of fact properly left to a jury.  121 F.3d at 22.  Here too the district court was correct in letting the jury decide.

---

[11]  Clemens concedes that his statements were not "political speech" protected by the First Amendment.  See Watts v. United States, 394 U.S. 705, 708 (1969) (per curiam).  However, he asks this court to view his statements differently from ordinary private speech because they were communicated to opposing counsel in the context of civil litigation.

To the extent he suggests the First Amendment treats speech between opposing counsel (or, in this case, a pro se litigant and opposing counsel) differently so as to warrant dismissal of the indictment in this case as a matter of law, he offers no support for this legal theory.  The context of his communications is, of course, relevant to the "true threats" inquiry, but that does not help him; it is still for the jury to make this fact-based assessment.

Other circuits agree.  <u>United States</u> v. <u>Stock</u>, 728 F.3d 287, 298 (3d Cir. 2013) ("In the usual case, whether a communication constitutes a threat or a true threat 'is a matter to be decided by the trier of fact.'" (quoting <u>United States</u> v. <u>Kosma</u>, 951 F.2d 549, 555 (3d Cir. 1991))); <u>see</u>, <u>e.g.</u>, <u>White</u>, 670 F.3d at 512 (whether speech constitutes a threat is an issue of fact for a jury); <u>Parr</u>, 545 F.3d at 497 (same); <u>Malik</u>, 16 F.3d at 49 (same).  There may be cases where no reasonable jury could conclude the statements were threats, but this is not one.  <u>See</u> <u>United States</u> v. <u>Alkhabaz</u>, 104 F.3d 1492, 1496 (6th Cir. 1997).

C.        <u>Sufficiency of the Evidence</u>

Turning from his argument that his statements as a matter of law were not threats, Clemens next argues the evidence before the jury was not sufficient.  Because Clemens never challenged the sufficiency of the evidence at trial,[12] we review the evidence only to determine if there is a "clear and gross injustice." <u>United States</u> v. <u>Hicks</u>, 575 F.3d 130, 139 (1st Cir. 2009) (quoting <u>United States</u> v. <u>Gobbi</u>, 471 F.3d 302, 309 (1st Cir. 2006)) (internal quotation mark omitted).

A jury could easily conclude Clemens had intentionally made true threats.  Here Clemens sent an email that warned Pfaff to "watch [his] backside," that they might meet in a "back alley,"

---

[12]   Clemens did not move for a judgment of acquittal at the close of the government's evidence or at the close of all of the evidence; nor did he move for a post-verdict judgment of acquittal.

-27-

that Pfaff was playing a "very dangerous game," that Clemens wished Pfaff were dead, that he hoped a 10-ton beam would fall on Pfaff, and that he had a feeling someone would "get hurt REAL BAD." Clemens forwarded the email to Vinchesi, with the note to her, "You all might be digging yourself a grave."

The victims did in fact feel fear Clemens would physically harm them after reading the emails and acted to protect themselves. Pfaff took several precautions, including sending a photo of Clemens to his wife and asking for patrol cars to circle his home. Vinchesi also took precautions, meeting with Scituate's Chief of Police. The jury verdict was firmly based in the evidence. See Nishnianidze, 342 F.3d at 16 ("While the fact-finder may consider other evidence, including the effect of the statement on the recipient, the ultimate standard is an objective one -- whether a reasonable person would understand the statement to be threatening."); Fulmer, 108 F.3d at 1500 (commenting that "evidence of the recipient's reactions" is relevant to "what a person making the statement should have reasonably foreseen"); see also Mitchell v. United States, 141 F.3d 8, 17 (1st Cir. 1998) (noting that even where challenges to evidence are preserved, an appellate court cannot disturb a factfinder's weighing of evidence and credibility determinations except for clear error).

Clemens's claim that his statements were not threatening because they were made to an opposing counsel during civil

litigation is also unavailing.  To the contrary, a jury could have found the perceived threat was more likely to be carried out given that litigation was contentious and the significance of the suit to Clemens.

The judgment is <u>affirmed</u>.