**[J-84-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| IN THE INTEREST OF: J.J.M., A MINOR | : | No. 23 MAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: J.J.M., A MINOR | : | Superior Court at No. 1245 MDA |
| | : | 2018 dated September 10, 2019 |
| | : | Affirming the Order of the Luzerne |
| | : | County Court of Common Pleas, |
| | : | Juvenile Division, at No. CP-40-JV- |
| | : | 0000119-2018 dated May 14, 2018. |
| | : | |
| | : | ARGUED:  October 20, 2020 |


*Justice Dougherty delivers the opinion of the Court with respect to Parts I, II, III, and IV(a) and announces the judgment of the Court with respect to all other issues.*


<u>**OPINION**</u>


**JUSTICE DOUGHERTY**[1]                              **DECIDED:  December 21, 2021**

We recently observed it "remains an open question" whether the First Amendment to the United States Constitution permits States to criminalize threats made in reckless disregard of the risk of causing fear.  *Commonwealth v. Knox*, 190 A.3d 1146, 1157 n.10 (Pa. 2018).  We now resolve that unsettled issue.  Like the court below, we hold the First Amendment tolerates a conviction — in this case, under Pennsylvania's terroristic threats statute, 18 Pa.C.S. §2706(a)(3) — for making a threatening statement even where the speaker did not intend to cause terror.  However, upon our *de novo* review of the record, we are constrained to conclude the statements underlying appellant J.J.M.'s adjudication,

---

[1] This case was reassigned to this author.

though perhaps concerning to some because they were uttered in a school hallway only days after a deadly high school shooting, did not cross the constitutional threshold from protected speech to an unprotected true threat. We therefore vacate appellant's adjudication of delinquency.

## I. Background

Some time between mid-January and the early part of February 2018, K.S., a 14-year-old student at West Side Career and Technology Center ("WSCTS"), a vocational high school, heard appellant, a 15-year-old student at the school, say he "doesn't think people deserve to live and everyone should just die." N.T. Hearing, 4/26/2018 at 22. K.S., who described appellant as a loner who likes to wear black attire, did not report the statement to school officials at that time. It was not until weeks later when some "friends approached [her]" with information pertaining to a second statement by appellant that K.S. began to worry about the comments. Id. at 25.

Appellant's second statement was made on February 20, 2018, six days after 17 high school students at Marjory Stoneman Douglas High School in Parkland, Florida were fatally shot. M.W., a 15-year-old classmate of appellant's, overheard appellant say "[h]e wanted to beat the record of 19." Id. at 14.[2] M.W. heard this statement from only two or three feet away while in the hallway between classes. Although appellant's remark was not directed at her, M.W. was unsure whether he was "talking to someone [else], or [if] he just said it" aloud. Id. Still, M.W. found the comment concerning enough to report it to school administrators before the day's end.[3] Meanwhile, K.S., after learning of appellant's

---

[2] As noted, 17 students were tragically killed in the Parkland incident, not 19. However, M.W. candidly acknowledged during her testimony that she could not recall the precise number referenced by appellant. See N.T. Hearing, 4/26/2018 at 14 ("Was it 19? . . . I think that's the number.").

[3] More precisely, M.W. testified she alerted school officials because she felt "it was concerning due to past statements. I felt it needed to be taken seriously." N.T. Hearing,

"beat the record" statement secondhand, followed suit and reported what she had heard. *See id.* at 25 ("[A]fter I heard other statements [appellant]'s made, I then spoke up about it because it was a serious problem. . . . I was nervous. I was scared."). Following these reports, appellant was expelled from WSCTS.

The Commonwealth later charged appellant with terroristic threats pursuant to Section 2706(a)(1) and (3) of the Crimes Code,[4] and disorderly conduct. Following a hearing before a juvenile master, at which K.S. and M.W. testified as recounted above, appellant was adjudicated delinquent of one charge of terroristic threats under Section 2706(a)(3); the remaining charges were not substantiated. In support of its ruling, the juvenile master stated:

> [Appellant] did commit the offense of [terroristic threats under Section 2706(a)(3),] having communicated indirectly, and having caused terror and serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience by way of committing the following acts: He

---

4/26/2018 at 15. She further asserted, without elaboration, that she had in the past heard appellant say "[t]hings in reference to death and such[,]" and that he had "shown signs of possibly being violent." *Id.* at 13, 15. But, as will be discussed in greater detail *infra*, the master who presided over the hearing sustained appellant's objection to any references regarding "past statements" he supposedly made. *See id.* at 16 (striking "any reference to 'past statements'" from M.W.'s testimony). And the prosecutor expressly declined to challenge that ruling. *See id.* (explaining the Commonwealth was "not concerned with past statements" since "the statement [M.W.] heard in the hall is sufficient").

[4] Section 2706(a) provides:

**(a) Offense defined.**--A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to:

(1) commit any crime of violence with intent to terrorize another;

(2) cause evacuation of a building, place of assembly or facility of public transportation; or

(3) otherwise cause serious public inconvenience, or cause terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience.

18 Pa.C.S. §2706(a).

spoke in the hallway at school, in a manner that was heard by others — within days of a mass school shooting — stating that he wanted to beat the record of 19, and by further stating that he doesn't think people deserve to live, and everyone should just die.

Such statements caused terror in the witnesses, and furthermore caused serious public inconvenience because the witnesses missed their classes or school work in order to seek help and guidance, and report the matter. The matter also required the convention of a school hearing to determine what actions needed to be taken to both protect the school students, and prevent such future incidences.

Juvenile Master's Findings of Fact, 4/26/2018 at 1. As part of its disposition, the juvenile master placed appellant on probation, ordered him to comply with any mental health recommendations, and prohibited him from having contact with weapons.

Appellant filed an appeal, and the matter proceeded to a *de novo* hearing before the Luzerne County Court of Common Pleas. By the parties' agreement, the trial court received the audio testimony and transcript from the prior proceeding in lieu of recalling the witnesses. Based on that evidence, on May 14, 2018, the trial court upheld appellant's adjudication of delinquency under Section 2706(a)(3). Appellant then filed a post-dispositional motion arguing, *inter alia*, that the subsection under which he was adjudicated violates the First Amendment. The trial court denied the motion on July 16, 2018. Regarding appellant's free speech claim, the trial court briefly remarked appellant's statements "were threats that invaded [K.S.'s and M.W.'s] sense of personal security and caused psychological concern[,]" Trial Court Opinion, 7/16/2018 at 9, but it did not directly confront the First Amendment issue.

Appellant next appealed to the Superior Court, arguing, first, that the evidence was insufficient to sustain his adjudication because his statements did not constitute threats, and because he did not possess the necessary *mens rea* for conviction under Section 2706(a)(3). He also continued to claim Section 2706(a)(3) is unconstitutional in that it violates the right to free speech under the First Amendment. As well, appellant alleged Section 2706(a)(3) is unconstitutionally vague on its face and as applied, such that it

violates his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

A unanimous three-judge panel of the Superior Court affirmed appellant's adjudication of delinquency in a published opinion. *In the Interest of: J.J.M.*, 219 A.3d 174 (Pa. Super. 2019). The court first rejected appellant's challenge to the sufficiency of the evidence. Appellant's argument in support of this claim was twofold: (1) he asserted his statements did not amount to a true threat; and (2) he maintained the evidence did not support a finding of a *mens rea* beyond mere negligence, because there was no evidence establishing he knew that anyone who overheard his statement would associate it with previous school shootings. The court was not convinced. Pointing to the recent proliferation of school shootings in America and, in particular, the high school shooting in Parkland less than a week earlier, the court reasoned that "from this context and the circumstances surrounding [a]ppellant's statement, the words expressed an intent to cause harm and an indication of impending menace." *Id.* at 181.[5] For similar reasons, the court did "not hesitate to conclude [ a]ppellant consciously disregarded a substantial and unjustifiable risk that his threat would terrorize his fellow students." *Id.*, *citing* 18 Pa.C.S. §302(a)(3) (defining recklessness).

Turning to appellant's claim Section 2706(a)(3) violates his First Amendment right to free speech, the Superior Court began by acknowledging that children do not "'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Id.* at 182, *quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Yet, it further observed the United States Supreme Court has "repeatedly

---

[5] In response to appellant's assertion he could not have anticipated that other students would relay his second statement to K.S., to whom he previously expressed his view that people "should just die," the Superior Court clarified that "[a]ppellant's 'beat the record' statement . . . was itself alone sufficient to constitute a terroristic threat." *J.J.M.*, 219 A.3d at 181 n.6.

emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools[,]" and that "[p]art of a school's awesome charge is to balance the exercise of rights that enrich learning with order and a safe and productive school environment." *Id.* (citations and quotations omitted).

The Superior Court also recognized that neither this Court, nor the High Court, has specifically decided "whether threats communicated not with the subjective intent to terrorize, but instead with reckless disregard for the risk of causing terror in the listener, [are protected] under the First Amendment." *Id.* at 183. Nevertheless, citing our decision in *Knox*, *supra*, the Superior Court opined we would likely require some inquiry into the speaker's mental state and "would not apply a wholly objective test focused only upon the effects a threat had upon the recipients as some of the federal circuits employ." *Id.* at 184. Ultimately, the court resolved that, "in the context of the special circumstances attendant with threats made in a school setting, a threat made with the mental state of recklessness, *i.e.*, with conscious disregard of the risk of causing terror, constitutes a true threat falling outside the scope of the protections of the First Amendment." *Id.* Applying this understanding of the law to the facts, the Superior Court concluded:

> [T]he Commonwealth[ ] . . . established that [a]ppellant communicated a true threat that was not protected by the First Amendment. The circumstances surrounding [a]ppellant's statement that he "wanted to beat the record of 19" evidenced that it was a threat, and that [a]ppellant communicated it with a conscious disregard for the likelihood that his words would engender fear in those who heard them. Appellant's subjective mental state was such that he acted with knowledge of its wrongness, for the events of the day in question . . . do not suggest that [a]ppellant spoke to express an opinion, or that he was just jesting, or even that he was merely negligent in inducing fear in his schoolmates.
>
> Rather, [a]ppellant, who had cultivated an image among his classmates as one who relished the thought of death to human beings, must have known the effect that his words would have upon his fellow students in the wake of the Parkland shooting. Yet he chose to utter them anyway, in school, in the hallway between classes, for anyone and everyone around him to hear. We

do not believe the First Amendment is or ever was intended to give [a]ppellant a protected right to do so.

*Id.* at 184-85 (footnote omitted).

Finally, the Superior Court rejected appellant's claim that Section 2706(a)(3) is void for vagueness, relying upon extant and longstanding case law holding otherwise. *See id.* at 185, *citing, e.g.*, *Commonwealth v. Chance*, 458 A.2d 1371, 1375 (Pa. Super. 1983) (Section 2706 describes "the category of unlawful activity with sufficient precision as to place a person charged with such an offense on notice as to what conduct was proscribed by the statute"). And the court likewise rejected appellant's related claim that the statute is unconstitutionally vague as applied to him because "he had no reason to expect, based upon the language of the statute, that he could be in violation of it through the combination of two different statements that he said weeks apart from each other." *Id.* at 185-86. In this respect, the Superior Court reiterated its position that appellant's singular statement that he wanted to "beat the record" — and not any of his prior statements generally alluding to death — "was the threat that sustains his adjudication." *Id.* at 186; *see also id.* ("Appellant's prior communications about his affinity for 'death and such' to his fellow students were not necessary to make the expression of his aspirations to 'beat the record' a threat.").

Appellant subsequently filed a timely petition for allowance of appeal. We granted review to consider, as a matter of first impression, whether, in permitting a conviction for terroristic threats upon a showing of mere recklessness on behalf of the speaker, Section 2706(a)(3) is unconstitutionally overbroad because it criminalizes speech that may be protected under the First Amendment. *In the Interest of: J.J.M.*, 228 A.3d 487 (Pa. 2020) (*per curiam*).[6]

---

[6] Appellant additionally sought discretionary review of the sufficiency of his adjudication of delinquency under Section 2706(a)(3). We did not grant review of that issue. As we

## II. Relevant Precedent

We begin with a review of First Amendment jurisprudence generally and the true threat doctrine specifically. The First Amendment, made applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. CONST. amend. I. "The hallmark of the protection of free speech is to allow free trade in ideas — even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (plurality) (internal quotations and citation omitted); *see also Knox*, 190 A.3d at 1154 ("First Amendment freedoms apply . . . equally to cultured, intellectual expressions and to crude, offensive, or tawdry ones."). Naturally, then, "[a]s protector of this exchange of ideas, the First Amendment, as a general proposition, prevents government from proscribing speech . . . because of disapproval of the ideas expressed." *J.S. ex rel H.S. v. Bethlehem Area Sch. Dist.*, 807 A.2d 847, 854 (Pa. 2002) (internal quotations and citation omitted), *abrogated by Knox, supra*; *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

But even though the freedom of speech is "rightfully cherished" by the people and "jealously guarded" by the courts, it is not absolute. *J.S.*, 807 A.2d at 854. "From 1791 to the present," our society "has permitted restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83 (1992), *quoting Chaplinsky v.*

_____

will elaborate more fully below, however, the question before us nevertheless entails a factual component requiring our independent review of the record.

*New Hampshire*, 315 U.S. 568, 572 (1942). Examples of types of speech which may be regulated if they are likely to inflict unacceptable harm include fighting words, *see Chaplinsky*; incitement to imminent lawlessness, *see Brandenburg v. Ohio*, 395 U.S. 444 (1969) (*per curiam*); obscenity, *see Miller v. California*, 413 U.S. 15 (1973); defamation, *see New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); and child pornography, fraud, and other speech "integral to criminal conduct[.]" *United States v. Alvarez*, 567 U.S. 709, 717 (2012). The prevention and punishment of these "certain well-defined and narrowly limited classes of speech . . . have never been thought to raise any Constitutional problem." *Chaplinsky*, 315 U.S. at 571-72; *see also Bose Corp. v. Consumers Union*, 466 U.S. 485, 504 (1984) (the "majestic protection" of the First Amendment does not extend to categories of speech that play no essential part of any exposition of ideas).

Speech which communicates a serious expression of intent to commit an act of unlawful violence against a particular individual or group of individuals — more commonly referred to as a "true threat" — is another "certain class of speech that the United States Supreme Court has determined is beyond the protective ambit of the First Amendment." *J.S.*, 807 A.2d at 856; *see also R.A.V.*, 505 U.S. at 388 ("threats of violence are outside the First Amendment"). True threats are not covered by the umbrella of First Amendment protections due to the need to shield individuals "from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur[.]" *R.A.V.*, 505 U.S. at 388. For these indisputably valid reasons, true threats are not immunized by the First Amendment, and the Constitution reserves for the States the right to determine whether "speech which threatens unlawful violence [should] subject the speaker to criminal sanction." *Knox*, 190 A.3d at 1155.

The true threat category of speech lies at the heart of this case. The United States Supreme Court first examined such speech in *Watts v. United States*, 394 U.S. 705 (1969)

(*per curiam*). Watts was attending a discussion group in Washington, D.C., during the Vietnam War, when the military draft was in effect. After someone suggested that young people become more educated before expressing their views, Watts responded:

> They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. [(*i.e.*, United States President Lyndon Baines Johnson).]

*Id.* at 706 (internal quotations omitted).

Watts was convicted of threatening the President in violation of 18 U.S.C. §871(a). On appeal, the High Court overturned Watts's conviction. Although the Court held the federal statute was facially valid in light of the overwhelming interest in physically protecting the President and allowing him to perform his duties without threat of violence, it further concluded Watts's conviction could be upheld only if his words conveyed an actual threat, as opposed to political hyperbole. Upon consideration of the full context of Watts's statement — including that it was made during a political debate; was conditioned on an event that Watts vowed would never occur (his induction into the military); and was greeted by laughter from the audience — the Court determined the statement was merely an expression of political dissent, rather than a true threat.

Following *Watts*, a number of courts, including this one, focused on contextual circumstances when evaluating whether a speaker's words constituted a true threat, utilizing an objective listener standard. For example, in *J.S., supra*, an eighth-grade student, J.S., created a website from his home computer titled "Teacher Sux." The website contained derogatory, profane, offensive, and threatening comments about his algebra teacher. One page of the website set forth reasons why J.S. believed the teacher should face termination, while another page depicted her face as Adolf Hitler. Yet another page was captioned "Why Should She Die?" and included a request that viewers donate

$20 "to help pay for the hitman." 807 A.2d at 851. The website was full of expletives and derogatory content regarding the teacher, including a drawing showing her in a decapitated state, with blood dripping from her neck. The teacher became aware of the website and believed the threats to be serious, such that she contacted local police and the F.B.I. Law enforcement declined to file charges, but the school district expelled J.S. He then appealed his expulsion to the court of common pleas, claiming it violated his First Amendment right to free speech because, *inter alia*, his speech did not constitute a true threat. The trial court affirmed, as did the Commonwealth Court, and we granted discretionary review.

Relying on various federal decisions we deemed consistent with *Watts*, we explained that, in determining whether speech falls within the definition of a true threat — "that is, if the communication is a serious expression of intent to inflict harm" — courts must "consider the statements, the context in which they were made, the reaction of listeners and others as well as the nature of the comments[.]" *Id.* at 858. We observed the statements and website were not communicated directly to the teacher, and, in fact, included a notice that school faculty should not view the website; there was no evidence that J.S. had made similar statements to the teacher on other occasions; and there was no evidence that the teacher, though distraught after viewing the website, "had any reason to believe that J.S. had the propensity to engage in violence, more than any other student of his age." *Id.* at 859. So we determined that, under the totality of those circumstances, J.S.'s speech was not a true threat; it was merely "a sophomoric, crude, highly offensive and perhaps misguided attempt at humor or parody" which "did not reflect a serious expression of intent to inflict harm." *Id.*[7]

---

[7] Two other observations regarding *J.S.* warrant brief mention. First, we focused considerable attention in that case to the "difficult jurisprudential task" of addressing "constitutional issues [that] intersect with the unique school setting." *J.S.,* 807 A.2d at

In 2003, the United States Supreme Court again addressed the concept of a true threat in *Black*, *supra*. There, the Court examined a Virginia statute that made it unlawful to burn a cross in public or on another's property with the intent to intimidate any person or group. Significantly, the statute expressly identified the act of burning a cross as *prima facie* evidence of an intent to intimidate. The Virginia Supreme Court ruled the statute unconstitutional for two reasons: (1) it discriminated on the basis of content, in that it "selectively chooses only cross burning because of its distinctive message"; and (2) the statutory presumption of intent rendered the statute overbroad because the "enhanced probability of prosecution under the statute chills the expression of protected speech[.]" *Black v. Commonwealth*, 553 S.E.2d 738, 744, 746 (Va. 2001). Upon review, a majority of the High Court determined that, while the statute did not violate the First Amendment insofar as it criminalized cross burning done with an intent to intimidate, the statutory

855. And we did so for good reason: the United States Supreme Court has "made clear that courts must apply the First Amendment 'in light of the special characteristics of the school environment.'" *Mahanoy Area Sch. Dist. v. B.L.*, ___ U.S. ___, 141 S.Ct. 2038, 2044 (2021), *quoting Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988); *accord Tinker*, 393 U.S. at 513 (schools have special interest in regulating speech that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others"). Here, though, our concern is not with school discipline but whether the elements of a criminal statute have been proved — it just so happens the speech that is criminalized under that statute was uttered by a student in a school. Thus, because this case involves a criminal statute, and the High Court has not suggested there is a different definition of true threats for juveniles versus adults, our decision herein should not be understood as relying to any degree on "the leeway the First Amendment grants to schools in light of their special characteristics[.]" *Mahanoy Area Sch. Dist.*, 141 S.Ct. at 2046. *Cf. Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) (students' First Amendment rights in public school "are not automatically coextensive with the rights of adults in other settings").

Second, and relatedly, since J.S. was not subjected to prosecution pursuant to a criminal statute, we had no occasion in that case to address the "controversy regarding the type of intent that is required before one can be convicted." *J.S.*, 807 A.2d at 858 n.8. Of course, that is the issue we resolve presently.

presumption that the burning of a cross was *prima facie* evidence of an intent to intimidate a person or group of persons was unconstitutional under the First Amendment.

In reaching the former holding, Justice O'Connor, in a portion of her lead opinion garnering a majority of the Court, observed:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *See Watts v. United States*, [394 U.S. at 708] ("political hyberbole" is not a true threat); *R.A.V. v. City of St. Paul*, [505 U.S. at 388]. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." [*Id.*] Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death. Respondents do not contest that some cross burnings fit within this meaning of intimidating speech, and rightly so. As noted . . ., the history of cross burning in this country shows that cross burning is often intimidating, intended to create a pervasive fear in victims that they are a target of violence.

*Black*, 538 U.S. at 359-60. After prefacing its discussion with this passage — which, as will become apparent below, is subject to differing interpretations and is the source of much of the present dispute — the Court proceeded to reject the lower court's conclusion that the Virginia statute was unconstitutional because it discriminated on the basis of context and viewpoint. *See id.* at 363 ("A ban on cross burning carried out with the intent to intimidate is fully consistent with our holding in *R.A.V.* and is proscribable under the First Amendment.").

As for the separate issue of whether the statutory presumption that the burning of a cross was *prima facie* evidence of an intent to intimidate rendered the Virginia statute unconstitutionally overbroad, Justice O'Connor and three other Justices found that it did. The plurality explained that such a presumption "blurs the line" between constitutionally proscribable cross burnings intended to intimidate, and constitutionally protected cross

burnings not intended to intimidate, such as those meant only as statements of ideology or group solidarity, those aimed only to anger but not intimidate, or those undertaken in a dramatic performance. *Id.* at 365; *see id.* ("[T]he provision chills constitutionally protected political speech because of the possibility that the Commonwealth will prosecute — and potentially convict — somebody engaging only in lawful political speech at the core of what the First Amendment is designed to protect."). Therefore, the plurality concluded "the *prima facie* evidence provision, as interpreted through the jury instruction . . . is unconstitutional on its face." *Id.* at 367.[8]

Nearly a dozen years after *Black*, in *Elonis v. United States*, 575 U.S. 723 (2015), the United States Supreme Court reinforced its view that a speaker's mental state is an essential consideration in determining whether a statement constitutes a true threat. Elonis had posted rap lyrics and other material on Facebook. The lyrics contained violent language and imagery regarding his wife, coworkers, and others, albeit interspersed with disclaimers indicating the lyrics were fictitious and had no intentional resemblance to real

---

[8] The plurality comprising this section of Justice O'Connor's opinion — which included Chief Justice Rehnquist, Justice Stevens (who authored a separate concurring opinion), and Justice Breyer — noted the Virginia Supreme Court had not authoritatively interpreted the meaning of the *prima facie* evidence provision, and that it was "theoretically possib[le] that the court, on remand, could interpret the provision" in a manner that would avoid the constitutional deficiencies. *Black*, 538 U.S. at 367. Justice Souter, in a concurring and dissenting opinion joined by Justices Kennedy and Ginsburg, agreed with the plurality that the *prima facie* evidence provision rendered the statute facially unconstitutional because it effectively eliminated the intent requirement, but disagreed with the plurality's suggestion that the Virginia Supreme Court could, on remand, interpret the provision in a different manner so as to save the statute from facial invalidity. Justice Scalia, joined in part by Justice Thomas, agreed that banning cross burning done with the intent to intimidate does not violate the First Amendment, though he would have allowed case-by-case challenges to convictions where the State was not required to prove intent, rather than invaliding the statute's *prima facie* provision outright. Finally, Justice Thomas took the position in dissent that because the statute applied only to conduct, not expression, it did not implicate any First Amendment concerns; and, even applying First Amendment principles, Justice Thomas saw no problem with the fact that the statute would allow a jury to draw an inference of intent to intimidate from the cross burning itself.

people.  Eventually, Elonis was convicted of four counts of transmitting threats to injure in violation of 18 U.S.C. §875(c).  Before the High Court, he argued the district court erred in denying his request that the jury be instructed the government had to prove he intended to communicate a true threat.

The Supreme Court observed the federal statute under which Elonis was convicted was "meant to proscribe a broad class of threats . . . but did not identify what mental state, if any, a defendant must have to be convicted."  *Elonis*, 575 U.S. at 734.  The Court concluded Elonis's conviction could not stand because it was "premised solely on how his posts would be understood by a reasonable person[,]" and such a standard is "inconsistent with 'the conventional requirement for criminal conduct — **awareness** of some wrongdoing.'"  *Id.* at 737-38 (citation omitted and emphasis in original).  The Court further explained: "Having liability turn on whether 'a reasonable person' regards the communication as a threat — regardless of what the defendant thinks — 'reduces culpability on the all-important element of the crime to negligence,' and we 'have long been reluctant to infer that a negligence standard was intended in criminal statutes[.]'"  *Id.* at 738 (citations omitted).  Notably, since the parties did not brief or argue the issue of whether a finding of recklessness would suffice to sustain a conviction under Section 875(c), the Court did not resolve that specific question.

Since *Black*, courts have disagreed regarding whether — in order for a statement to constitute an unprotected true threat — the speaker must merely **intend to communicate** the statement or whether the speaker must **also intend that the statement be interpreted by the recipient** as a serious expression of an intent to commit an act of unlawful violence.  More simply stated, does the speaker's subjective intent to intimidate matter when determining whether particular speech constitutes an unprotected

true threat? Like we did in *J.S.* many years earlier, we pointedly recognized the absence of consensus on this issue in *Knox*.

Knox created a rap music video in which he threatened certain city police officers by name. After a third party posted the video to the internet, the Commonwealth charged and convicted Knox of terroristic threats under Section 2706(a)(1). On appeal, prior to analyzing whether the video constituted a true threat, we observed:

> Some [courts] have continued to use an objective, reasonable-person standard. These courts interpret *Black*'s intent requirement as applying to the act of transmitting the communication. *See United States v. Clemens*, 738 F.3d 1, 11 (1st Cir. 2013) (citing cases). In their view, an objective standard remains appropriate for judging whether the speech, taken in its full context, embodies a serious expression of an intent to commit unlawful violence. They reason from the premise that the First Amendment traditionally lifts its protections based on the injury inflicted rather than the speaker's guilty mind. *See, e.g., United States v. Jeffries*, 692 F.3d 473, 480 (6th Cir. 2012), *abrogation on other grounds recognized by United States v. Houston*, 683 Fed.Appx. 434, 438 (6th Cir. 2017); *United States v. White*, 670 F.3d 498, 508-09 (4th Cir. 2012), *abrogated on other grounds by United States v. White*, 810 F.3d 212, 220 (4th Cir. 2016).
>
> Other courts have read *Black* as implying that the First Amendment only allows the government to penalize threatening speech uttered with the highest level of scienter, namely, a specific intent to intimidate or terrorize. *See United States v. Cassel*, 408 F.3d 622, 632-33 (9th Cir. 2005); *but cf. Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2008) (observing that the Ninth Circuit has not consistently followed a subjective-intent standard). Still others have charted something of a middle course, suggesting that "an entirely objective definition [of a true threat] is no longer tenable" after *Black*, while reserving judgment on whether the standard should be subjective only, or a subjective-objective combination pursuant to which a statement "must objectively **be** a threat and subjectively be **intended** as such." *United States v. Parr*, 545 F.3d 491, 500 (7th Cir. 2008) (emphasis in original).

*Knox*, 190 A.3d at 1156.

We acknowledged in *Knox* that, pursuant to the High Court's decision in *Black*, "an objective, reasonable-listener standard such as that used in *J.S.* is no longer viable for purposes of a criminal prosecution pursuant to a general anti-threat enactment." *Id.* at 1156-57. We recognized that "the First Amendment necessitates an inquiry into the

speaker's mental state[,]" noting that the Justices in *Black* who found the Virginia statute's presumption to be constitutionally problematic appeared to focus on "values and concerns associated with the First Amendment: the social undesirability of suppressing ideas, punishing points of view, or criminalizing statements of solidarity or ideology." *Id.* at 1157. We further opined that, "[c]onstruing the [*Black*] Court's discussion of the speaker's intent as pertaining solely to the act of transmitting the speech appears difficult to harmonize with" its remark that "'[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons **with the intent of placing the victim in fear** of bodily harm or death.'" *Id.* (emphasis in original), *quoting Black*, 538 U.S. at 360.

While acknowledging that the High Court had expressly left open the question of "whether a statute which criminalizes threatening statements spoken with a lower scienter threshold, such as knowledge or reckless disregard of their threatening nature, can survive First Amendment scrutiny[,]" *id.* at 1157 n.10, we deduced two specific principles from *Black*: "First, the Constitution allows [S]tates to criminalize threatening speech which is specifically intended to terrorize or intimidate. Second, in evaluating whether the speaker acted with an intent to terrorize or intimidate, evidentiary weight should be given to contextual circumstances such as those referenced in *Watts*." *Id.* at 1158 (footnote omitted). These contextual factors include whether the threat was conditional, whether it was communicated directly to the victim, whether the victim had reason to believe the speaker had a propensity to engage in violence, and how listeners reacted to the speech. *See id.*

Applying these principles to the rap video in *Knox*, we observed Knox's threats were mostly unconditional; the officer who first viewed the video immediately notified police personnel, suggesting he did not view the video as satire or social commentary;

and the officers named in the video were concerned for their safety and took measures to avoid becoming victims of violence. We determined the fact the video was not communicated directly to the police, but had been uploaded to the internet by a third party, did not negate an intent by Knox that it would be viewed by the officers. Ultimately, we concluded Knox's video demonstrated a subjective intent on his part to terrorize or intimidate the police officers, such that it constituted a true threat. Thus, we upheld Knox's terroristic threats conviction under Section 2706(a)(1).[9]

### III. Arguments

Cognizant of these relevant precedents, we now consider the parties' arguments. The thrust of appellant's position is that a standard of "reckless disregard, rather than subjective intent, is not and cannot be narrowly tailored to protect an individual's right to free speech in balance with the government's interest to protect others from the fear of violence." Appellant's Brief at 31. Appellant maintains that allowing a conviction (or, as here, an adjudication of delinquency) for terroristic threats under Section 2706(a)(3) based merely upon a showing of recklessness will require individuals to speculate as to how others will perceive their speech, potentially casting too wide a net and criminalizing

---

[9] Justice Wecht authored a concurring and dissenting opinion in *Knox*, joined by Justice Donohue, in which he agreed with the majority that *Black* rendered the previously applied objective reasonable-listener standard for determining whether speech was a true threat no longer viable. *See Knox*, 190 A.3d at 1161 (Wecht, J., concurring and dissenting). Justice Wecht further agreed with the majority's conclusion that "an assessment of the speaker's subjective intent" is necessary in determining whether speech constituted a true threat, and he joined the majority in affirming Knox's conviction. However, Justice Wecht disagreed with the majority's decision not "to consider the more important question of whether the First Amendment **requires** proof of specific intent, or whether the [First] Amendment would tolerate punishment of speech based upon proof of only a lesser *mens rea* such as recklessness or knowledge" — and he then proceeded to supply his answer to that question. *Id*. at 1162 (emphasis in original). In contrast, the *Knox* majority found it unnecessary in that case to consider whether a conviction based on a lower *mens rea* would violate the First Amendment, given its conclusion the evidence was sufficient to support a finding Knox acted with **subjective intent** to terrorize and intimidate.

permissible speech. *See, e.g.*, *In the Interest of R.D.*, 464 P.3d 717, 733-34 (Colo. 2020) ("[W]hether a particular reader or listener will react with fear to particular words is far too unpredictable a metric for First Amendment protection. Such a rule would not give sufficient 'breathing space' to the freedom of speech."). Appellant asserts this lower standard of scienter is particularly problematic when applied to adolescents and teenagers, whose acuity of others' perception may not be fully developed because they lack maturity and experience. Along these lines, appellant suggests our decision in *J.S.* — where we concluded J.S.'s statements, taken as a whole, were "sophomoric, crude, highly offensive and perhaps [a] misguided attempt at humor or parody" but "did not reflect a serious expression of intent to inflict harm[,]" *J.S.*, 807 A.2d at 859 — supports his position that a finding of subjective intent by the speaker to cause fear is necessary in order for speech to constitute a true threat.[10]

Appellant also attacks the Superior Court's decision below, asserting it "appears to have been driven by an objective reasonable [listener] standard and a singular context, [*i.e.*,] the prevalence of school shootings within the United States." Appellant's Brief at 17. In appellant's view, the lower court's focus should have been on his subjective state of mind, and he suggests its ruling conflicts with the United States Supreme Court's decision in *Watts*, which, like this case, involved speech made during a period of national concern regarding widespread violence. Appellant posits that — in light of the fact that Watts's statement was made shortly after the assassinations of President John F.

---

[10] The American Civil Liberties Union of Pennsylvania ("ACLU") filed an *amicus curiae* brief in support of appellant, elaborating on many of these same points. *See, e.g.*, ACLU's Brief at 2 (arguing against permitting "a lower standard for intent in the context of [Section 2706] for statements made in school settings because of the well-documented differences between teenagers and adults"). Notably, the ACLU, like appellant, argues that reckless speech "is more akin to negligent speech than to any threat made with the intent or knowledge that the statement would be deemed a threat." *Id.* at 8; *accord* Appellant's Brief at 30 (characterizing recklessness as "almost akin to negligence").

Kennedy, Martin Luther King, Jr., and Senator Robert F. Kennedy, as well as the riots at the Democratic Convention in Chicago in 1968 — if the High Court in *Watts* had been "solely contextually and objectively driven by the reasonable person standard for either speaker or recipient in its analysis," it likely would have determined that Watts's statement was a true threat that was not entitled to First Amendment protection. *Id.*

Beyond drawing this parallel, appellant emphasizes the *Knox* Court concluded that, although a true threat falls outside the protection of the First Amendment, the determination of whether particular speech constitutes a true threat requires an evaluation of whether the speaker acted with intent to terrorize or intimidate, while also considering the contextual circumstances. Moreover, appellant urges us to embrace the two-prong approach articulated by Justice Wecht in his concurring and dissenting opinion in *Knox*. That suggested approach would require reviewing courts to: (1) "conduct an objective analysis to determine whether reasonable recipients would consider the statement to be a serious expression of intent to inflict harm, and not merely jest, hyperbole, or a steam valve"; and (2) "conduct a subjective analysis to ascertain whether the speaker specifically intended to intimidate the victim or victims, or intended his expression to be received as a threat to the victim or victims." *Knox*, 190 A.3d at 1165 (Wecht, J., concurring and dissenting) (internal citation and quotations omitted). Failure to satisfy either prong, under this theory, would remove the speech from First Amendment protection.

As a final point, appellant contrasts the contextual circumstances surrounding his statements from those in *J.S.* and *Knox*. He submits his first statement — that he "doesn't think people deserve to live and everyone should just die[,]" N.T. Hearing, 4/26/2018 at 22 — expressed only an opinion, not a threat. And he contends his second statement — that he "wanted to beat the record of 19[,]" *id*. at 14 — was vague and ambiguous. In this

vein, appellant highlights that neither statement was communicated to a specific person or group of people; there was no evidence that, at the time he made his second statement, he was personally aware of the recent Parkland shooting; there was no evidence he had a propensity to engage in violence; and, finally, the other students' reactions were based on their own knowledge of the Parkland shooting and their subjective perspectives. Thus, appellant concludes his statement did not constitute a true threat, even when viewed under the standards set forth in *J.S.* and *Knox*.

In response, the Commonwealth concedes that, in accordance with *Knox*, to be properly convicted of making a true threat, "a defendant's mental state must go beyond mere negligence." Commonwealth's Brief at 19. The Commonwealth further recognizes the contextual factors that must be considered when determining if speech constitutes a true threat: whether it was conditional; whether it was communicated directly to the victim; whether the victim had reason to believe the speaker had a propensity to engage in violence; and how the listeners reacted to the speech. However, the Commonwealth argues, the true threat exception is intended to protect against not only actual violence, but the fear of violence and the disruption that such fear creates. As the Commonwealth sees it, when appellant's speech is evaluated in context, it "was more than enough to constitute a 'true threat.'" *Id.*; *see id.* at 20-21 (explaining that appellant's statement that he "wanted to beat the record of 19" was unconditional and made in a school hallway, loudly enough for others to hear; appellant "had presented himself as someone interested in death"; and his statement frightened K.S. and M.W., particularly since it was made "in the wake of a 'record' school shooting in the news").

The Commonwealth also takes issue with the attempt by appellant and his *amicus* to "conflat[e] recklessness and negligence[.]" *Id.* at 24. From the Commonwealth's perspective, the separate opinions authored by Justices Alito and Thomas in *Elonis* are

"instructive" on this point. *Id.* at 25. Taking Justice Alito's concurring and dissenting opinion first, the Commonwealth opines that he "correctly argued that recklessness was an appropriate *mens rea* for a true threat." *Id.*, *citing Elonis*, 575 U.S. 745-46 (Alito, J., concurring and dissenting) ("There can be no real dispute that recklessness regarding a risk of serious harm is wrongful conduct. . . . Someone who acts recklessly with respect to conveying a threat necessarily grasps that he is not engaged in innocent conduct."). The Commonwealth finds further support in Justice Thomas's dissenting opinion, suggesting it demonstrates, "historically, the First Amendment has not required a *mens rea* of specific intent that a particular victim be harmed." *Id.* at 26, *citing Elonis*, 575 U.S. at 755 (Thomas, J., dissenting) ("At a minimum, there is no historical practice requiring more than general intent when a statute regulates speech.").

Finally, referencing the *Knox* Court's recognition of the conflicting interpretations of *Black*, the Commonwealth contends appellant's proposed standard — which would require the government "to prove that a defendant intentionally and specifically directed a terroristic threat to a particular victim" — has been adopted only by a minority of courts. *Id.* at 28. In fact, the Commonwealth underscores, some courts "still maintain limited *mens rea* requirements[,]" requiring no subjective intent or, alternatively, "a more general reasonable person test, with no specific reliance upon either the speaker or the listener." *Id.* at 27-28 (internal citation and quotations omitted); *see id.* (collecting cases).[11]

## IV. Analysis

As earlier noted, we granted discretionary review in this case to resolve a pointed issue: "Whether the Superior Court misapprehended controlling facts, in a case of first impression in this Commonwealth, when concluding that the terroristic threats statute,

---

[11] The Pennsylvania District Attorneys Association ("PDAA"), in its *amicus* brief, echoes in principal respect the arguments raised by the Commonwealth.

requiring only a conviction based upon recklessness, did not violate [appellant]'s First Amendment right under the United States Constitution to free speech?" *J.J.M.*, 228 A.3d 487.[12]  This presents a mixed question of fact and law, so "we defer to the trial court's fact findings which are supported by competent evidence and resolve any legal questions, such as the scope of the true-threat doctrine, *de novo*." *Knox*, 190 A.3d at 1152.  We also emphasize, as a preliminary matter, the strong presumption in the law that legislative enactments do not violate the Constitution.  *See, e.g.*, *Commonwealth v. Mayfield*, 832 A.2d 418, 421 (Pa. 2003) (we presume "'the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth'"), *quoting* 1 Pa.C.S. §1922(3).  For that reason, there is a heavy burden of persuasion upon one who challenges the constitutionality of a statute, and we will not declare the provision unconstitutional "unless it clearly, palpably, and plainly violates the Constitution; all doubts are to be resolved in favor of a finding of constitutionality."  *Id.* (internal citation omitted).

**A.**

Mindful of this high bar, and upon careful review of all relevant authority and the parties' cogent arguments, we agree with the Superior Court, the Commonwealth, and the PDAA that the First Amendment does not prohibit the States from criminalizing threats made in reckless disregard of the risk of causing fear.  It necessarily follows, then, that there is no Constitutional problem with the fact that Section 2706(a)(3) of the Crimes Code permits a conviction for terroristic threats, *i.e.*, a true threat, even in the absence of any specific intent to intimidate by the speaker.  Rather, we conclude it is enough, to survive

---

[12] As the precise question upon which we granted review is plainly framed in terms of the First Amendment, we consequently do not consider any separate potential issue arising under the Pennsylvania Constitution.  *See* PA. CONST. art. I, §7 ("The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak . . . on any subject, being responsible for the abuse of that liberty.").

First Amendment scrutiny, that the statute requires proof of a conscious disregard of a substantial and unjustifiable risk of terrorizing or intimidating others.

We begin by dispatching the notion, embraced by the concurrence and many (if not all) of those courts that have ruled in a manner consistent with appellant's position, that the United States Supreme Court decided this issue in *Black*. *See State v. Boettger*, 450 P.3d 805, 815 (Kan. 2019) ("We conclude a majority of the *Black* Court determined an intent to intimidate was constitutionally, not just statutorily, required."); *United States v. Heineman*, 767 F.3d 970, 978 (10th Cir. 2014) ("We read *Black* as establishing that a defendant can be constitutionally convicted of making a true threat only if the defendant **intended** the recipient of the threat to feel threatened.") (emphasis in original); *United States v. Cassell*, 408 F.3d 622, 631 (9th Cir. 2005) (the "clear import" of *Black* "is that only **intentional** threats are criminally punishable consistently with the First Amendment") (emphasis in original). Respectfully, we disagree with this assessment.

Those courts concluding the First Amendment protects threats to commit violence unless the speaker specifically intended to place the victim in fear all seem to have relied, in substantial part, upon three statements from a passage of *Black* that garnered majority support. The first is that "'[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359. Second is the statement that "[t]he speaker need not actually intend to carry out the threat." *Id.* at 359-60. And the third is that intimidation "is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm of death." *Id.* at 360. These statements, as interpreted by the concurrence and this minority of other courts, compel "not only the requirement that the communication itself be intentional, but also the requirement that the speaker intend for his language to

**threaten** the victim." *Cassel*, 408 F.3d at 631 (emphasis in original). As we read them, however, none of these statements, whether taken individually or collectively, can bear the constitutional weight the concurrence and these other courts have ascribed to them.

Regarding the first statement above, we find it significant that the *Black* Court said only that true threats "encompass" — *i.e.*, include — threats intended to be interpreted as such, without necessarily excluding other kinds of expression. It would be a curious matter indeed for the Court to use this open-ended phrase if it actually meant to provide the sole definition of a true threat. The Court might have limited and circumscribed its definition by stating "True threats encompass **only** . . ." or "True threats **consist of** . . .," or something to similar effect. Moreover, we previously noted elsewhere that the *Black* Court had good reason to purposely use broad language to describe what constitutes an unprotected true threat. *See Knox*, 190 A.3d at 1157 n.10 (remarking the *Black* majority's use of open-ended language was "understandable as there was no need in that particular case to decide whether First Amendment protections fall away **only** when there is a specific intent to intimidate") (emphasis in original). Hence, this first statement is of limited significance to our inquiry.

Moving to the next statement, that "[t]he speaker need not actually intend to carry out the threat[,]" *Black*, 538 U.S. at 359-60, we reiterate again that only intentional threats were at issue in *Black*. *See id.* at 348 (explaining the challenged statute proscribed cross burnings carried out "'with the intent of intimidating'" a person or group), *quoting* Va. Code §18.2-423. Since the *Black* Court's entire discussion necessarily presupposed a specific intent to terrorize, its clarification that there need not be an intent to **act** on the threat is of little import in the present matter.

Finally, we also find the Court's statement that intimidation "is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing

the victim in fear of bodily harm or death[,]" *Black*, 538 U.S. at 360, to be of no legal consequence here. That sentence is best read as describing **one** "type of true threat," not the **only** type. It thus does nothing to aid appellant's position.

In short, we disagree with the concurrence and those courts that have concluded *Black* is dispositive, or even particularly instructive, as it pertains to the specific issue we confront in this appeal. From our respectful point of view, the concurrence and that minority of courts have simply read too much into *Black*. Instead, as we alluded in *Knox*, we are more persuaded by those judicial statements expressing the position that *Black* did not "'address[ ] whether the First Amendment requires a particular mental state for threat prosecutions.'" *Knox*, 190 A.3d at 1157 n.10, *quoting Elonis*, 575 U.S. at 765 (Thomas, J., dissenting).[13]

On a related score, while we are aware Justices Thomas and Alito have already indicated their apparent position on this issue — with the former going so far as to suggest that "[l]ower courts . . . can safely infer that a majority of this Court would not adopt an intent-to-threaten requirement," *Elonis*, 575 U.S. at 750 (Thomas, J., dissenting) — we also observe that at least one other member of the Court has undermined Justice

---

[13] The full quote from this portion of Justice Thomas's dissent in *Elonis*, which we repeated with approval in *Knox*, also opined that *Watts* is not determinative of the precise issue presented here. Notably, the *Watts* Court remarked it had "grave doubts" about the Seventh Circuit's construction of "willfully" in the presidential threats statute. *Watts*, 394 U.S. at 708. Some, most notably Justice Sotomayor, have cited this statement to support the argument that, "[t]ogether, *Watts* and *Black* . . . strongly suggest that . . . a jury must find that the speaker actually intended to convey a threat." *Perez v. Florida*, ___ U.S. ___, 137 S.Ct. 853, 855 (2017) (Sotomayor, J., concurring in the denial of *certiorari*). Again, however, our own views align more closely with Justice Thomas's on this point. *See Elonis*, 575 U.S. at 765 (Thomas, J., dissenting) ("'grave doubts' do not make a holding, and that stray statement in *Watts* is entitled to no precedential force"); *see also Kansas v. Boettger*, ___ U.S. ___, 140 S.Ct. 1956, 1958 (2020) (Thomas, J., dissenting from the denial of *certiorari*) ("[N]one of this Court's precedents have held that the First Amendment requires States to include intent to intimidate as an element in criminal threat statutes.").

Thomas's prediction. *See Perez v. Florida*, ___ U.S. ___, 137 S.Ct. 853, 854-55 (2017) (Sotomayor, J., concurring in the denial of *certiorari*) (suggesting recklessness would not be a sufficiently culpable state of mind to separate punishable conduct from protected speech). And so, in the absence of a definitive instruction from the High Court, and because it is clear the Justices are not of one mind on the issue, we must chart our own course.

We now return to the definition of the crime. Appellant was adjudicated delinquent under Section 2706(a)(3) of the Crimes Code. That statute provides that a person commits the crime of terroristic threats if he or she communicates, either directly or indirectly, a threat to cause serious public inconvenience, or causes terror or serious public inconvenience with reckless disregard of the risk of causing such terror or inconvenience. *See* 18 Pa.C.S. §2706(a)(3). Reckless disregard in this context entails "consciously disregard[ing] a substantial and unjustifiable risk" that the speech at issue will have a threatening or terrorizing effect, where the risk is of such a nature that "its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." 18 Pa.C.S. §302(b)(3).

Importantly, this Court has explained that recklessness "aligns . . . more closely with intentional conduct" than negligence. *Tayar v. Camelback Ski Corp.*, 47 A.3d 1190, 1201 (Pa. 2012). Negligence suggests accident or mere inadvertence, but recklessness denotes "'an extreme departure from ordinary care, a wanton or heedless indifference to consequences, an indifference whether or not wrong is done, and an indifference to the rights of others.'" *Id.*, *quoting* 57A AM. JUR.2d *Negligence* §274. We recently reaffirmed that understanding, expressing that "reckless conduct subsumes conscious behavior." *Commonwealth v. Johnson*, 231 A.3d 807, 826 (Pa. 2020).

In the present context, it is the risk of fear, terror, and intimidation, inherent to the threat itself, which is consciously disregarded by the reckless speaker. Even though the speaker may not specifically intend the prohibited result, he contemplates its substantial risk and chooses to ignore it. *See Elonis*, 575 U.S. 745-46 (Alito, J., concurring and dissenting) ("Someone who acts recklessly with respect to conveying a threat necessarily grasps that he is not engaged in innocent conduct. He is not merely careless. He is aware that others could regard his statements as a threat, but he delivers them anyway."). This knowing disregard of the potential harmful effects of the speech, *see R.A.V.*, 505 U.S. at 388 (threats of violence tend to instill a fear of violence, which in turn tends to disrupt the victim's life); *accord Commonwealth v. Jackson*, 215 A.3d 972, 981 (Pa. Super. 2019) (the harm which anti-threat statutes seek to avoid "is the psychological distress that follows an invasion of the victim's sense of personal security"), is more akin to a specific intent to threaten or terrorize than a state of mind characterized by carelessness. It stands to reason, then, that reckless speech as envisioned by Section 2706(a)(3) is morally culpable, and imposing criminal liability upon one who makes a reckless threat does not run afoul of the First Amendment.

We find significant support for this conclusion in the fact that the High Court has, in other First Amendment contexts, recognized recklessness is a sufficient *mens rea* to render speech proscribable. For example, in *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964), the Court determined "false statement[s] made with reckless disregard of the truth[ ] do not enjoy constitutional protection" in criminal libel. The Court reached a similar conclusion with regard to civil libel. *See New York Times Co.*, 376 U.S. at 279-80 (holding a public official may recover damages for defamatory falsehoods spoken with actual malice, that is, with knowledge that they were false "or with reckless disregard" for their truth or falsity); *see also Am. Future Sys., Inc. v. Better Business Bureau of E. Pa.*, 923

A.2d 389, 400 (Pa. 2007) (reciting that an even lower scienter such as ordinary negligence is constitutionally sufficient for liability relative to private-figure plaintiffs where the defamatory speech does not relate to a matter of public concern). As well, the High Court has held that one may be convicted of mailing obscenity under the First Amendment without proof he knew the materials were legally obscene, and thus without a specific intent to mail obscenities. *See Hamling v. United States*, 418 U.S. 87, 120 (1974). Nor has it expressed any problem with criminally punishing reckless possession of visual depictions of child pornography. *See Osborne v. Ohio*, 495 U.S. 103, 112 n.9 (1990).

In all of these cases involving other categories of unprotected speech, the United States Supreme Court determined the Constitution allowed prosecutions based on a scienter below intentionality. And, at the same time, we are unaware of a single case in which the Court has held that recklessness is an **insufficient** *mens rea* to separate constitutionally protected speech from that which is proscribable. We see no reason why threats to commit violence should be the category for which we break that new ground. In fact, doing so would lead to an undeniably perverse result: It would "give threats pride of place among unprotected speech." *Elonis*, 575 U.S. 767 (Alito, J., concurring and dissenting); *see also id.* at 766 (Thomas, J., dissenting) (requiring heightened mental state "would make threats one of the most protected categories of unprotected speech, thereby sowing tension throughout [the High Court's] First Amendment doctrine.").

If still more support for our position that recklessness may be punished in this context were required, history provides it. As Justice Thomas recently opined:

> It does not appear that the ratifiers of the First or Fourteenth Amendments understood the freedom of speech to protect reckless threats. In 1754, Parliament passed a statute making it a crime to "knowingly send any Letter without any Name subscribed thereto, or signed with a fictitious Name . . . threatening to kill or murder any of his Majesty's Subject or Subjects, or to burn their [property], though no Money or Venison, or other valuable Thing shall be demanded." 27 Geo. 2, ch. 15. English courts interpreted this statute to require what is known today as general intent — "that is, that the

defendant posses[s] knowledge with respect to the *actus reus* of the crime." *Carter v. United States*, 530 U.S. 255, 268 (2000). As the trial court instructed the jurors in one leading case, "if they were of the opinion that" the "terms of the letter conveyed an actual threat to kill or murder . . . and that the prisoner knew the contents of it, they ought to find him guilty." *King v. Girdwood*, 1 Leach 142, 143, 168 Eng. Rep. 173 (1776). Only "if they thought [the defendant] did not know the contents, or that the words might import any thing less than to kill or murder" should they acquit. [*Id.*] The Court of Crown approved this instruction. [*Id.*], 168 Eng. Rep., at 174; *see also Rex v. Boucher*, 4 Car. & P. 562, 563, 172 Eng. Rep. 826, 827 (N. P. 1831).

More than a dozen States and Territories enacted "copies" of this statute between the founding and Reconstruction. *Elonis*, *supra*, at 761 (Thomas, J., dissenting). New Jersey, for example, made it a crime to "knowingly send or deliver any letter or writing, with or without a name subscribed thereto, or signed with a fictitious name, . . . threatening to maim, wound, kill or murder any person, or to burn his or her [property], though no money, goods or chattels, or other valuable thing shall be demanded." 1796 N. J. Laws § 57, p. 108[.] . . . The founding and Reconstruction generations would have understood these statutes to require a mental state of general intent. *Girdwood* and other English decisions were familiar to American lawyers. *See*, *e.g.*, 7 N. Dane, *A General Abridgement and Digest of American Law* 31–32 (1824). And "where English statutes . . . have been adopted into our own legislation; the known and settled construction of those statutes by courts of law, has been considered as silently incorporated into the acts, or has been received with all the weight of authority." *Pennock v. Dialogue*, 2 Pet. 1, 18, 7 L.Ed. 327 (1829); *see also Elonis*, *supra*, at 760–763 (Thomas, J., dissenting). The prevalence of statutes from the founding through Reconstruction that did not require intent to intimidate provides strong evidence of the meaning of the freedom of speech protected by the Fourteenth Amendment.

This evidence is reinforced by the fact that many of these States also guaranteed the freedom of speech in their constitutions. . . . If statutes criminalizing reckless threats violated the freedom of speech, one would expect these States not to have such laws, but many of them did. At the very least, one would expect state courts to hold such laws unconstitutional, but it appears that none did. Near the end of the 19th century, one court observed that these laws had "never been supposed to be obnoxious to freedom of speech." *State v. McCabe*, 37 S.W. 123, 126 (Mo. 1896).

*Boettger*, 140 S.Ct. at 1957-58 (Thomas, J., dissenting from the denial of *certiorari*).

Notably, unlike "the Federal Government[, which] apparently did not get into the business of regulating threats until 1917," *Elonis*, 575 U.S. at 760 (Thomas, J.,

dissenting), Pennsylvania has been doing so since at least the mid-19th century. Similar to other early statutes of its kind, Pennsylvania's made it a crime to "knowingly . . . send, deliver or utter any letter or writing threatening to kill or murder any other person, or to burn or destroy any coal breaker, house, barn or other building, or any rick or stack of grain, hay or straw, or other agricultural produce[.]" Act of 1860, Mar. 31, Section 23, P.L. 382. This statute, an effective copy "of a 1754 English threat statute subject to only a general-intent requirement[,]" "penalize[d] transmitting a communication containing a threat without proof of a demand to extort something from the victim." *Elonis*, 575 U.S. at 761 (Thomas, J., dissenting).[14]

In our view, the very existence of this early Pennsylvania threat statute, which "did not require intent to intimidate[,] provides strong evidence of the meaning of the freedom of speech[.]" *Boettger*, 140 S.Ct. at 1957-58 (Thomas, J., dissenting from the denial of *certiorari*). This is particularly so since the freedom of speech has "been guaranteed since the first Pennsylvania Constitution, not simply as [a] restriction[ ] on the powers of government, as found in the Federal Constitution, but as [an] inherent and 'invaluable' right[ ] of man." *Commonwealth v. Tate*, 432 A.2d 1382, 1388 (Pa. 1981). Our research has uncovered nothing to indicate the courts in this Commonwealth ever considered the statute to require more than general intent, or that the absence of a heightened mental state was somehow repugnant to our own Charter, which places the freedom of speech

---

[14] A provision explicitly requiring proof of a specific "intent to extort" appeared alongside this law. *See* Act of 1860, Mar. 31, Section 23, P.L. 382 ("If any person shall knowingly send or deliver, or utter to any other person, any letter or writing accusing or threatening to accuse either the person to whom such letter or writing shall be sent or delivered, or any other person of any crime or misdemeanor punishable by law with imprisonment at labor, **with a view or intent to extort or gain** . . . **any property, money, security or other valuable thing from any person whatsoever** . . .") (emphasis added). We find it telling that the statute expressly incorporated an intent component with respect to one manner of committing the offense, yet simultaneously omitted such a requirement with respect to threats to commit violence.

on the highest of pedestals. *Cf. Boettger*, 140 S.Ct. at 1958 (Thomas, J., dissenting from the denial of *certiorari*) ("If statutes criminalizing reckless threats violated the freedom of speech, one would expect these States not to have such laws . . . [or, a]t the very least, one would expect state courts to hold such laws unconstitutional, but it appears that none did."). This relevant history fortifies our determination that the First Amendment has limited application to general anti-threat statutes, including those requiring only a mental state of recklessness.

There is still more support for our interpretation of the First Amendment. For one thing, a holding that proof of a specific intent to terrorize is affirmatively required under the First Amendment inevitably would also decide that a "knowingly" scienter is constitutionally inadequate for prosecution under a general anti-threat statute. *See* 18 Pa.C.S §302(b)(2) (defining the "knowingly" *mens rea* in terms of the actor's awareness that his conduct will almost certainly cause the undesirable result). In other words, if we were to interpret the First Amendment in the manner appellant and the concurrence suggest, and as only a few courts have done, it would, as a necessary consequence, also extend the First Amendment's protective shield to threatening speech uttered **with certainty** that it will terrorize and intimidate the victim**,** so long as that was not the speaker's subjective purpose. We are highly skeptical the First Amendment mandates this result.[15]

---

[15] Indeed, as we observed in *Knox*, where we candidly foretold we "are not fully aligned with the Ninth Circuit's view that, under *Black*, a specific intent to threaten is the *sine qua non* of a constitutionally punishable threat[,]" anti-threat statutes that criminalize conduct with a knowing *means rea* "are not uncommon." *Knox*, 190 A.3d at 1157 n.10 (internal quotations and citation omitted), *citing, e.g.*, 18 Pa.C.S. §4952(a) (penalizing threats communicated with a "knowing" *mens rea*).

As far as we can tell, at least seven other States also have statutes that criminalize threats made "knowingly." *See* Colo. Rev. Stat. Ann. §18-3-206 (menacing); Colo. Rev. Stat. Ann. §18-3-602(1)(a) (stalking); Md. Code Ann., Crim. Law §3-1001(b) (threats of crimes

Additionally, we observe our decision here places us squarely within the majority of jurisdictions to have considered this issue. For example, in *Major v. State*, 800 S.E.2d 348 (Ga. 2017), the Georgia Supreme Court rejected a First Amendment challenge to its reckless criminal threat statute, *Former* O.C.G.A. §16-11-37(a). The court held that because "recklessness requires a knowing act — *i.e.*, **conscious** disregard of a substantial risk — it fits within the definition of a true threat." 800 S.E.2d at 351 (emphasis in original). Likewise, the Connecticut Supreme Court, after explaining it was "persuaded by the reasoning of the courts that have concluded that *Black* did not adopt a subjective intent standard[,]" upheld the reckless portion of its own criminal threat statute, C.G.S. §53a-62(a)(2)(B). *State v. Taupier*, 193 A.3d 1, 18 (Conn. 2019). Still other state courts of last resort have similarly resisted invitations to interpret the First Amendment in a manner that would jeopardize their criminal threat statutes forbidding threats communicated in reckless disregard of the risk of causing terror. *See, e.g.*, *State v. Trey M.*, 383 P.3d 474, 481 (Wash. 2016) ("nothing in *Black* imposes in all cases an 'intent to

of violence); Me. Rev. Stat. tit. 17-A, §209(1) (criminal threatening); Tex. Penal Code Ann. §22.01(a)(2) (assault); Vt. Stat. Ann. tit. 13, §1702(a)(1)-(2) (criminal threatening); Wash. Rev. Code Ann. §9A.46.020(1)(a) (harassment); W.Va. Code Ann. §61-6-24(b) (threats of terrorist acts).

Of course, far more States — fifteen others, by our count — have laws with a criminal provision that, like Section 2706(a)(3), tracks the Model Penal Code and criminalizes threats made in reckless disregard of their potential to instill fear. *See* Alaska Stat. Ann. §11.56.810(a)(1)(A) (terroristic threatening); Ariz. Rev. Stat. Ann. §13-1202(A)(2) (threatening or intimidating); Conn. Gen. Stat. Ann. §53a-62(a)(2)(B) (second degree threatening); Del. Code Ann. tit. 11, §621(a)(2)(c) (terroristic threatening); Ga. Code Ann. §16-11-37(b)(2)(D) (terroristic threat); Haw. Rev. Stat. Ann. §707-715(2) (terroristic threatening); Kan. Stat. Ann §21-5415 (criminal threat); Minn. Stat. Ann. §609.713 (threats of violence); Mo. Ann. Stat. §574.120 (second degree making a terrorist threat); N.H. Rev. Stat. Ann. §631:4(I)(e), (f) (criminal threatening); N.D. Cent. Code Ann. §12.1-17-04 (terrorizing); N.J. Stat. Ann. §2C:12-3(a) (terroristic threats); Neb. Rev. Stat. Ann. §28-311.01(1)(c) (terroristic threats); Wisc. Stat. Ann. §947.019(1)(e) (terroristic threats); Wyo. Stat. Ann. §6-2-505(a) (terroristic threats). We do not take lightly the prevalence of such statutes throughout the country, none of which could stand if the First Amendment truly imposed a specific intent-to-threaten requirement.

intimidate' requirement in order to avoid a First Amendment violation"); *People v. Lowery*, 257 P.3d 72, 77 (Cal. 2011) ("the category of threats that can be punished by the criminal law without violating the First Amendment includes but is not limited to threatening statements made with the specific intent to intimidate") (emphasis omitted); *Hearn v. State*, 3 So.3d 722, 739 n.22 (Miss. 2008) ("[t]he protected status of threatening speech is not based upon the subjective intent of the speaker"). And, as we expounded in *Knox* (and as the Commonwealth reminds us here), a significant number of state and federal courts have staked an even broader position, in that they believe an "objective standard remains appropriate for judging whether the speech, taken in its full context, embodies a serious expression of an intent to commit unlawful violence." *Knox*, 190 A.3d at 1156 (discussing cases). We declined to go that far in *Knox*, and we remain unwilling to join those courts that fall on the far other end of the spectrum and impose, as a matter of constitutional law, a specific intent-to-threaten requirement for threat statutes like Section 2706. Rather, our holding today places us somewhere in the middle of these extremes.

To summarize, in *Knox* we resolved that "the First Amendment necessitates an inquiry into the speaker's mental state" when dealing with general anti-threat statutes. *Id*. at 1157. But we expressly left open the question "whether a statute which criminalizes threatening statements spoken with a lower scienter threshold, such as knowledge or reckless disregard of their threatening nature, can survive First Amendment scrutiny." *Id*. at 1157 n.10. For the reasons set forth at length throughout this opinion, we now hold it can. As we see it, recklessness — which, to reiterate, entails a conscious disregard by the speaker of a substantial and unjustifiable risk that his speech will have a threatening or terrorizing effect — is a culpable mental state more analogous to intentional conduct than carelessness. We thus conclude "the government has the right, if not the duty, to 'protect[ ] individuals from the fear of violence, from the disruption that fear engenders,

and from the possibility that the threatened violence will occur,' all of which places [reckless threats] 'outside the First Amendment.'" *Jeffries*, 692 F.3d at 478, *quoting R.A.V.*, 505 U.S. at 388 (additional citations omitted).[16]

**B.**

Now that we have determined recklessness is a sufficiently culpable state of mind to separate permissibly punishable speech from protected speech, only one task remains. That charge is implied by the question we accepted for review, which asks, in relevant part, "[w]hether the Superior Court misapprehended controlling facts" in reaching its legal conclusions. *J.J.M.*, 228 A.3d 487. And it is no minor formality: the United States Supreme Court repeatedly has explained "that in cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp.*, 466 U.S. at 499, *quoting New York Times Co.*, 376 U.S. at 284-86.[17]

As such, we proceed to determine whether the record here supports the Superior Court's conclusion that appellant recklessly uttered a true threat, which, as we have said,

---

[16] Although we are confident in our conclusions in this regard, we nevertheless observe, as many other courts have, that the High Court's further guidance on this area of the law is sorely needed. To take just one example, recall that the Kansas Supreme Court recently confronted this exact issue in *Boettger*, *supra*. Yet, despite the fact the statute at issue in that case was nearly identical to our Section 2706(a)(3) — both are derived from the Model Penal Code — the legal conclusions drawn by the Kansas Supreme Court differ from ours in every significant respect. This disjointed state of affairs naturally calls for the High Court's intervention.

[17] Notwithstanding this mandate, we do not foreclose the possibility that this Court, in an appropriate case, could accept and resolve a pure issue of law and then remand to the intermediate appellate court for such review. However, since the question framed and accepted for our consideration in the present dispute subsumes an evaluation, based on the record, of whether facts were misconstrued, we find it appropriate to conduct this assessment ourselves to resolve the appeal.

would not be entitled to First Amendment protection. In conducting this review, we do not disturb historical facts — who, what, when, how. Rather, our task "as expositors of the Constitution" is merely to "decide whether the evidence in the record is sufficient to cross the constitutional threshold" out of First Amendment protection. *Bose*, 466 U.S. at 511. Consistent with our decision in *Knox*, this inquiry requires us to consider objective contextual circumstances surrounding the challenged statement as well as an analysis of the speaker's subjective intent in making it. *See Knox*, 190 A.3d at 1158. These objective considerations, we have long recognized, include "the statements, the context in which they were made, the reaction of listeners and others as well as the nature of the comments[.]" *J.S.*, 807 A.2d at 858; *see also Knox*, 190 A.3d at 1159 (relevant contextual factors include "whether the threat was conditional, whether it was communicated directly to the victim, whether the victim had reason to believe the speaker had a propensity to engage in violence, and how the listeners reacted to the speech").

Upon our independent review of the record, and after considering all the factors identified above, we respectfully disagree with the Superior Court's determination, adopted by the concurring and dissenting opinion, that appellant's speech crossed the line from protected expression to a proscribable true threat uttered with reckless disregard for the risk of causing terror in the listener. Our *de novo* review of the evidence reveals it is just too feeble to support the conclusion appellant made a threat as defined by Section 2706(a)(3). The entire record demonstrates only that appellant expressed an opinion to one person, and then, weeks later, another person overheard him make a facially ambiguous statement either to himself or an unidentified third party. The first statement, an opinion, surely was entitled to constitutional protection; the second statement was too vague to constitute a true threat, and, in any event, the circumstances do not establish

appellant's "conscious disregard" of the risk he might cause terror in his listeners. Neither statement supports appellant's adjudication.

We restate again those facts pertinent to the analysis that derive support from the record.[18] K.S. testified that at some point "a few weeks before" February 20, 2018, she heard appellant state "that he doesn't think people deserve to live and everyone should just die." N.T. Hearing, 4/26/2018 at 22; *see also id.* at 29 ("The statement that I heard was that he thought people should die, people, like, shouldn't live."). K.S. did not report the statement at that time. Weeks later, however, she learned from some "friends [who] approached" her that appellant had made another statement. *Id.* at 25. M.W., whom we assume is one of the friends referred to by K.S., overheard this second statement — that appellant "wanted to beat the record of 19[,]" *id.* at 14 — from two to three feet away while in the hallway between classes at WSCTS. The statement was not aimed at M.W., nor did she know to whom it was directed; M.W.'s best guess was that appellant "was either talking to someone, or he just said it." *Id.* Despite this uncertainty, M.W. did not attempt to discover with whom (if anyone) appellant was speaking, or to learn what he meant by the remark. *See id.* at 18 (testifying she felt further inquiry "was unneeded"). But M.W. did alert school officials to it "within the school day[,]" which apparently prompted K.S. to do the same regarding the statement she heard appellant express weeks earlier. *Id.* at

---

[18] The trial court sat in *de novo* review of the adjudication rendered by the juvenile master, but because the parties apparently were satisfied with the evidentiary record created at the adjudication hearing, they opted simply to submit a copy of that material to the trial court for its independent judgment. As we understand the situation, the parties' stipulation that the trial court was to render its decision based only on the record created at the adjudication hearing, without taking any new evidence, also bound the trial court to the juvenile master's evidentiary rulings. So the record, for present purposes, is comprised only of that evidence admitted by the juvenile master at the adjudication hearing. *See* Trial Court Opinion, 7/16/2018 at 10 (explaining it was "constrained only as to the testimony offered in the record").

M.W. and K.S. both explained they reported this information to school administrators because they were "concerned" or "scared" by what appellant had stated. *See id.* (M.W. testifying she was "concern[ed]" and "felt it needed to be taken seriously"); *id.* at 25, (K.S. testifying "it was a serious problem" and that she was "scared" and "nervous" because she "didn't know what was going to happen" in light of her own awareness of "previous school shootings").[19]

The Superior Court concluded this evidence was sufficient to establish appellant communicated a true treat that was not protected by the First Amendment. It reasoned: "The circumstances surrounding [a]ppellant's statement that he 'wanted to beat the record of 19' evidenced that it was a threat, and that [a]ppellant communicated it with a conscious disregard for the likelihood that his words would engender fear in those who heard them." *J.J.M.*, 219 A.3d at 184-85 (footnote omitted). Relative to appellant's subjective mental state, the court explained the evidence demonstrated appellant knew his statement constituted wrongful conduct since "the events of the day in question . . . do not suggest that [he] spoke to express an opinion, or that he was just jesting, or even that he was merely negligent in inducing fear in his schoolmates." *Id.* at 185. "Rather," the court continued, "[a]ppellant, who had cultivated an image among his classmates as one who relished the thought of death to human beings, must have known the effect that his words would have upon his fellow students in the wake of the Parkland shooting. Yet he chose to utter them anyway, in school, in the hallway between classes, for anyone and everyone

---

[19] Also appearing throughout the record are various references to other "statements" that appellant allegedly made at prior unspecified times. *See* N.T. Hearing, 4/26/2018 at 13 (M.W. explaining she once heard appellant say "[t]hings in reference to death and such" in a science class they shared together); *id.* at 15 (M.W. suggesting she was concerned "due to past statements" and because appellant had "shown signs of possibly being violent"); *id.* at 16 (M.W. expressing there were "past instances that have happened that led up to [her] concern"). All of this material, however, was stricken from the record by the juvenile master. *See id.* ("any reference to 'past statements'" from M.W.'s testimony deemed inadmissible). Consequently, we do not consider this testimony in our analysis.

around him to hear. We do not believe the First Amendment is or ever was intended to give [a]ppellant a protected right to do so." *Id.* (citation omitted). We cannot agree.

One major flaw with the Superior Court's analysis is that it plainly was based on suppositions and generalizations lacking any support in the record. For example, when we strip the record of those references to "past statements" ruled inadmissible by the juvenile master, *see supra* n.19, there is virtually nothing left to support the lower court's characterization of appellant as someone "who had cultivated an image among his classmates as one who relished the thought of death to human beings[.]" *J.J.M.*, 219 A.3d at 185. Similarly, nothing supports the notion that "anyone and everyone" around appellant in the hallway was capable of hearing his statement. The most we can say, based on the record before us, is that appellant apparently made the statement in such a manner that **one** person — M.W. — was able to overhear it from two or three feet away. We likewise are unable to endorse the Superior Court's statement that appellant expressed "a desire to become the most prolific high school shooter in history." *Id.* at 186. That portrayal is a far cry from appellant's actual, more ambiguous statement that he "wanted to beat the record of 19" — which, as appellant notes, could just as easily have been a reference to "participation in a video game or any other competition." Appellant's Brief at 32.

Beyond these mischaracterizations of the record, we also tend to agree with appellant's assertion that "the Superior Court appears to have been driven by an objective reasonable [listener] standard and a singular context, [*i.e.*,] the prevalence of school shootings within the United States." Appellant's Brief at 17. To be sure, the lower court recited the proper test, which is consistent with the principles we reaffirm today:

> In determining whether particular speech constitutes a true threat, consideration of both the speaker's scienter and the contextual circumstances is required. *. . .* Relevant contextual factors include "whether the threat was conditional, whether it was communicated directly to the

victim, whether the victim had reason to believe the speaker had a propensity to engage in violence, and how listeners reacted to the speech."

*J.J.M.*, 219 A.3d at 183, *quoting Knox*, 190 A.3d at 1159. However, the court then proceeded to essentially flip this burden back on appellant, by requiring him to provide some context demonstrating his statement **was not a true threat**. *See id.* at 185 (noting there was no evidence to "suggest that [a]ppellant spoke to express an opinion, or that he was just jesting"). But it is the government that must produce admissible evidence from which a court can evaluate the necessary contextual factors to discern whether a given statement is a true threat that may be punished; that burden of production most certainly does not fall upon the defendant.

That the lower court was so focused on facts not in the record (as opposed to those that are), and on what appellant failed to disprove (as opposed to what the government proved), is perhaps not surprising given the sparse record before us. Consider first the statement testified to by K.S., *i.e.*, that appellant "doesn't think people deserve to live and everyone should just die." N.T. Hearing, 4/26/2018 at 22. No context whatever was offered in support of this statement other than the fact that K.S. apparently did not find it troubling enough to warrant an immediate report. It is, moreover, clearly couched in terms of appellant's personal (albeit non-conformist and morbid) opinion. That appellant held such a macabre view may well have been offensive to some, including K.S., but such speech is nevertheless shielded by the First Amendment except where it is a true threat. *See, e.g.*, *Knox*, 190 A.3d at 1154 (First Amendment applies "equally to cultured, intellectual expressions and to crude, offensive, or tawdry ones"); *J.S.*, 807 A.2d at 860 ("Distasteful and even highly offensive communication does not necessarily fall from First Amendment protection as a true threat simply because of its objectionable nature."). Nothing here indicates it was. Accordingly, this first statement enjoys First Amendment protection.

So too does appellant's statement that he "wanted to beat the record of 19." N.T. Hearing, 4/26/2018 at 14. As with the first statement, almost no context was provided regarding this second statement. Of course, it was uttered in a school hallway six days after the Parkland shooting, and M.W. overheard it from two or three feet away. But the record tells us nothing more, such as the tone or volume of appellant's voice when he uttered the statement, what it was in reference to, or even to whom it was directed. *See* Appellant's Brief at 32 ("At the time of the statement, [appellant] was not involved or engaged in any conduct which could be construed as threatening or outwardly violent, nor is there any indication that the expression was made in a menacing tone or when [he] was in a state or anger, or the result of animosity towards another[.]"). The vagueness surrounding both the content and context of this statement convinces us it was not a true threat.

Moreover, although we recognize some listeners might hear appellant's statement as threatening because it was uttered in a school hallway in the wake of the Parkland shooting, that is not enough to prove it was made with a reckless — that is, a conscious — disregard of a substantial and unjustifiable risk of causing terror. *See* 18 Pa.C.S. §2706(a)(3); §302(b)(3). There is simply no evidence on this record from which to conclude **appellant** was aware the ambiguous remark he made might cause a serious public inconvenience or terror, and consciously proceeded to disregard that risk. *See* Appellant's Brief at 33 ("Never was there any testimony or evidence presented that [appellant knew] of any recent school shootings, [or] had acted violently or in a physically menacing manner while at school[.]"); *id.* at 36 ("no testimony was presented that [appellant] had a history of fighting at school, arguing with teachers or other students, or bringing or attempting to bring weapons to the school"). Nor does the mere fact that one unintended recipient overheard it and became subjectively concerned suffice to establish

**appellant's** state of mind. *See R.D.*, 464 P.3d at 733 (warning courts that "placing significant weight on the subjective reaction of a statement's **unintended** recipients" creates risk of punishing speaker "for the content of a message that has been decoupled from its context") (emphasis in original).

Thus, our independent review of the entire record reveals that neither of appellant's statements was a true threat, and he did not utter them with conscious disregard of the risk of causing terror in any event.[20] Either of these independent reasons compels the same result: Appellant's adjudication for terroristic threats under Section 2706(a)(3) — on this record — violates the First Amendment, and must be vacated.

**C.**

We take this opportunity to express some final remarks. Notwithstanding our legal determination that appellant's statements here were not punishable by the relevant statutes, we emphasize we are fully cognizant of the tragic increase in school shootings and the detrimental impact the fear of such incidents has on parents, teachers, and students alike. The fact that most school children are now required to participate in "active shooter drills" is a sad indication of the prevalence of these incidents. Students should be encouraged to notify their parents and/or school authorities if they hear or read alarming comments or communications, just as K.S. and M.W. did in this case. And it is incumbent upon school officials to investigate such reports and take the necessary

---

[20] Parenthetically, we note the prosecutor appeared to be under the mistaken impression that consciousness was not relevant to its case. *See* N.T. Hearing, 4/26/2018 at 43, 45 (arguing "the intent of the . . . actor is not relevant" and that "[i]t's not what [appellant] intended, but it's the effect that he had on other people"). The prosecutor compounded this error by reciting an incomplete definition of recklessness, one which ignored the fact that recklessness requires proof of some subjective awareness, *i.e.*, a conscious disregard of the risks associated with the conduct at issue. *See id.* at 43. In this way, the prosecution seemingly lowered the applicable bar for its case from recklessness to mere negligence. Although this obviously is problematic in its own right, *see Elonis*, 575 U.S. at 739, given our disposition, we need not address this particular issue further.

measures to ensure the safety of all involved. Indeed, we express no opinion on the school's decision to expel appellant, except to note it should come as no surprise that the school responded with a sense of urgency and solemnity to what it believed was a genuine threat uttered within its walls. Even unlikely threats should trigger serious consideration and thoughtful response.

But it is also a serious matter when the government, as opposed to a school, steps in and decides to charge any person, let alone a juvenile, with a crime for his or her speech. As this case demonstrates, there is a fine line between protected speech and speech that legitimately may be regulated, and courts have an unyielding duty to jealously guard the essential protections guaranteed by the First Amendment. Without question, the government is authorized to prosecute true threats — including in close-call cases like this one. However, when it pursues that extreme step, it must be prepared to present significantly more evidence than it did here.

Adjudication of delinquency vacated.

Justice Saylor joins the opinion.

Justice Todd files a concurring opinion joining Parts I, II, and III of the opinion and its mandate to vacate the adjudication of delinquency in which Justices Donohue and Wecht join.

Justice Mundy files a concurring and dissenting opinion joining Parts I, II, III, and IV(a) in which Chief Justice Baer joins.